CONNECTICUT LIGHT AND POWER COMPANY *v.*
LIGHTHOUSE LANDINGS, INC.
(SC 17552)

LIGHTHOUSE LANDINGS, INC. *v.* CONNECTICUT
LIGHT AND POWER COMPANY
(SC 17553)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued January 9—officially released July 11, 2006

*John R. Horvack, Jr.*, with whom, on the brief, were *Giovanna Tiberii Weller* and *Jonathan M. Weiser*, for the appellant in both cases (Connecticut Light and Power Company).

*Scott M. Harrington*, with whom, on the brief, was *Anne C. LeVasseur*, for the appellee in both cases (Lighthouse Landings, Inc.).

*Opinion*

ZARELLA, J. In this consolidated appeal, the Connecticut Light and Power Company (power company), as owner and landlord of waterfront property in the city of Stamford, challenges the trial court's rulings in two separate actions involving the power company's termination of a commercial lease agreement with Lighthouse Landings, Inc. (Lighthouse). In the first appeal, which arises out of a declaratory judgment action brought by the power company against Lighthouse, the power company claims that the trial court improperly reinstated the lease under the doctrine of equitable nonforfeiture. In the second appeal, which arises out of a civil action for damages brought by Lighthouse against the power company, the power company claims that the trial court improperly granted

Lighthouse's application for prejudgment remedy. We agree with the claims advanced by the power company in both appeals and, accordingly, reverse the judgments of the trial court.

The record reveals the following undisputed facts and procedural history. On November 30, 1999, the power company leased a parcel of land in Stamford to Lighthouse for the purpose of operating a high speed ferry service between Stamford and New York City. The leased parcel consisted of 3.6 acres within a larger twenty-five acre tract, also owned by the power company. Article five of the lease provided: "The Premises will be used as a ferry service terminal including, without limitation, a parking lot, ticket office, terminal and dock for Tenant's vessels." Article six of the lease provided in relevant part: "[The] Tenant shall diligently proceed to obtain all governmental permits, approvals, licenses and/or certificates required in connection with Tenant's use of the Premises . . . .

"If Tenant has not obtained all such Permits within one hundred eighty (180) days after the date of this Lease, then Tenant shall have the right to either (i) terminate this Lease or (ii) extend the contingency period for another sixty (60) days . . . if Tenant exercises its right to extend the contingency period for an additional sixty (60) days, and if Tenant has not obtained all such Permits within the additional sixty (60) days, then Landlord and Tenant shall each have the right to terminate the lease by notice given to the other party within ten (10) days after the expiration of said sixty (60) day period. In the event that either party elects to terminate this Lease in accordance with this Paragraph [six], the Lease shall terminate as of the date of such notice of termination and thereafter neither party shall have any obligations or liability hereunder, except those which arose prior to the termination date. Landlord agrees to cooperate with Tenant in connection

with the Permits; Tenant agrees to reimburse Landlord for its out of pocket costs incurred at Tenant's request in connection with obtaining the Permits." Article one of the lease required Lighthouse to make rental payments to the power company commencing March 1, 2000.

The 180 day period for obtaining permits described in article six began to run on November 30, 1999, and expired on May 29, 2000. When Lighthouse failed to obtain the required permits within the stipulated time, it exercised its option to extend the lease for an additional sixty days, until July 28, 2000. Lighthouse subsequently failed to obtain the permits by the end of the extended period.[1] Accordingly, the power company sent notice terminating the lease to Lighthouse by letter dated August 3, 2000, and the lease thereby was terminated on August 4, 2000, the date Lighthouse received actual notice of the termination.

Shortly thereafter, Lighthouse commenced a civil action against the power company, alleging improper termination of the lease. In its amended complaint, Lighthouse alleged, inter alia, that the power company improperly had (1) induced Lighthouse to request the sixty day extension, thereby granting the power company the right to terminate the lease at the end of the extended period if Lighthouse did not obtain all applicable governmental permits within the specified time, even though Lighthouse was not legally obligated to terminate or to extend the lease after the first 180 days, and (2) exercised its right to terminate the lease when Lighthouse failed to obtain the required permits, despite prior assurances, on which Lighthouse had relied in exercising its right to extend the lease, that it did not

---

[1] Lighthouse did not file its first permit application until July 31, 2000, three days following the expiration of the extended approval period.

intend to do so.[2] Lighthouse further alleged that the reason the power company wanted to terminate the lease was because, unbeknownst to Lighthouse, the power company was negotiating a lucrative deal with another party, Strand/BRC Group, LLC (Strand), to purchase the entire twenty-five acre parcel, including the leased premises. On the basis of these allegations, Lighthouse sought an award of damages for breach of lease,

[2] Lighthouse's amended complaint, filed on July 10, 2003, alleges in relevant part: "11. During May of 2000, [Lighthouse] discussed with [the power company] its efforts to obtain governmental approvals to operate a fast ferry service at the Leased Premises and advised [the power company] that the approvals would take some time.

"12. During those discussions, [the power company] represented that it looked forward to a long term relationship with [Lighthouse], encouraged [Lighthouse] to move forward to seek its governmental approvals, and encouraged [Lighthouse] to extend the contingency period to obtain governmental permits an additional sixty days, and [Lighthouse] extended the contingency period in light of those representations.

"13. In or about July of 2000, [Lighthouse] communicated with and advised the [power company] that the governmental permitting process was taking longer than anticipated but that [Lighthouse] intended to honor the Lease and would not terminate the Lease because of any inability to obtain governmental permits.

"14. On or about July 10, 2000, [Lighthouse] wrote to [the power company] regarding the issue of the governmental permits and sought its agreement that the issue had been satisfied to the extent necessary and that the Lease could not be terminated by either party because of any permit issue. . . .

"15. [The power company] acknowledged to [Lighthouse] that the Lease was still in effect and the permits issue would not be used to attempt to terminate the Lease, which [the power company] confirmed in writing by letter dated July 17, 2000. . . .

"16. On or about July 19, 2000, [Lighthouse], in reliance on [the power company's] representations that the Lease was in force and effect and would continue to be in force regardless of any permit issues, entered into a binding contract for the purchase of a high speed ferry specifically for use for the ferry service contemplated at the Leased Premises . . . .

"17. On or about July 19, 2000, [Lighthouse] paid the shipbuilder an additional nonrefundable deposit . . . in connection with the aforementioned contract.

"18. On or about August 3, 2000, contrary to its representations set forth above, the [power company] sent a notice to [Lighthouse] attempting to terminate the Lease pursuant to [article six] of the Lease because [Lighthouse] had not yet obtained the governmental permits."

unfair trade practices, intentional misrepresentation, negligent misrepresentation and breach of the duty of good faith and fair dealing.

On October 13, 2000, the power company filed an action for a judgment declaring[3] that the lease with Lighthouse had been terminated properly and was "of no further force and effect." On December 7, 2000, the two actions were consolidated and transferred to the Complex Litigation Docket at Stamford. On December 21, 2000, during a pretrial conference on other matters pending in the consolidated actions,[4] the trial court expressed its view that, under applicable caselaw, the power company had terminated the lease "fairly [and] properly" in accordance with its provisions, but that the court could reinstate the lease on equitable grounds.[5] The court also informed the parties that it intended to proceed with a trial to the court on the declaratory judgment action while discovery continued on the civil action.

Thereafter, Lighthouse filed an answer, six special defenses and a counterclaim in the declaratory judgment proceeding. In its fifth special defense[6] and coun-

---

[3] The operative complaint in this action is the power company's amended complaint dated January 17, 2001.

[4] The hearing was held to dispose of two outstanding motions filed in the consolidated action and to establish a schedule for future proceedings.

[5] The court advised: "[*Fountain Co.* v. *Stein*, 97 Conn. 619, 118 A. 47 (1922)], says [the power company] has properly terminated the lease. [The power company] was within their rights to terminate the lease. [The power company] did not waive. [The power company] did everything in accordance with the lease terms and terminated the lease fairly, properly and . . . yet [*Fountain Co.*] says [that the court] can reinstate the lease on equitable grounds because it's not fair that they rely on the technicality."

[6] The fifth special defense alleged as follows: "Assuming, arguendo, that the [power company] properly terminated the Lease, [Lighthouse] is entitled to reinstatement of the Lease and relief from forfeiture as a result of one or more of the following:

"1. The [power company] is not entitled to the relief sought in its complaint for the reason that the [power company] comes before the court with unclean hands by wrongfully inducing [Lighthouse] to grant the [power company] the right to terminate, and by wrongfully terminating the Lease after it had waived its right to do so.

terclaim,[7] Lighthouse alleged, inter alia, that the power company wrongfully had induced Lighthouse to extend the lease and had refused to allow Lighthouse to mitigate its damages following improper termination of the lease by interfering with its efforts to obtain the applicable governmental permits. Lighthouse also alleged that termination of the lease, absent equitable relief, would cause it to suffer a loss wholly disproportionate to the loss suffered by the power company, which, according to Lighthouse, was reparable.[8] Lighthouse thus requested that the lease be reinstated pursuant to the doctrine of equitable nonforfeiture.

Following a trial to the court, the court issued a memorandum of decision dated August 28, 2002

"2. [Lighthouse's] delay in the acquisition of all applicable permits within the time stated in the Lease was slight and reasonable.

"3. [Lighthouse's] delay in the acquisition of all applicable permits within the time stated in the Lease caused no damage to the [power company].

"4. The [power company] has prevented [Lighthouse] from completing the permitting process and otherwise attempting to cure its failure to obtain all applicable permits.

"5. Given the unique nature, location and suitability of the subject premises as it relates to the operation of high speed ferry service from a transportation hub in Stamford, Connecticut, the termination of the Lease would result in irreparable harm and in such a hardship to [Lighthouse] as to make it unconscionable to enforce literally the conditions of the Lease.

"6. In the absence of equitable relief, [Lighthouse] will suffer a loss wholly disproportionate to the injury to the [power company], and injury suffered by the [power company] is reparable.

"7. Should the court grant the equitable relief sought by [Lighthouse], [Lighthouse] will make the [power company] whole by using its best efforts to complete the permitting process in as timely a manner as is reasonably possible in order to initiate the operation of ferry service as contemplated in the parties' Lease, and will otherwise continue to comply with the remaining terms of the Lease."

[7] The counterclaim alleged in relevant part: "4. The [power company] is in breach of its duty to cooperate with [Lighthouse] to obtain permits pursuant to Article [six] of the lease. . . .

"7. The [power company] has refused to allow [Lighthouse] to mitigate its damages by interfering with [Lighthouse's] efforts, subsequent to [the power company's] improper termination of the Lease, to obtain the applicable governmental permits."

[8] A landlord's injury is reparable if it can "be remedied by money instead of forfeiture of the tenancy." *Fellows* v. *Martin*, 217 Conn. 57, 69, 584 A.2d 458 (1991).

(August 28 decision), in which it concluded that the lease had been terminated properly in accordance with article six, but that the lease should be reinstated pursuant to the doctrine of equitable nonforfeiture. The trial court concluded that "forfeiture of the lease would destroy [Lighthouse's] contemplated high speed ferry operation at that site and substantially affect [Lighthouse's] large capital investment in that operation. [Furthermore, Lighthouse] is willing to pay the back rent. [The power company] will not lose the benefit of its November 30, 1999 lease. . . .

"[Lighthouse] shall have the obligation to pay to [the power company] all rental monies due.[9] [The power company] shall have the obligation to permit access to the leased premises including execution of all documents and permits necessary for [Lighthouse] 'to obtain all governmental permits, approvals, licenses and/or certificates required in connection with [Lighthouse's] use of the premises.' The 180 day period and 60 day extension period as set forth in [a]rticle [six] having expired, that portion of [a]rticle [six] is void." The court added that it would retain continuing jurisdiction over the "litigation and all issues in regards to the lease, rent and permits" and that the decision was an appealable final judgment. Neither party filed an appeal challenging the trial court's August 28 decision or filed a motion requesting an extension of time to take an appeal within the twenty day appeal period.[10] See Practice Book § 63-1 (a).

On January 13, 2003, the power company filed a motion seeking payment of back rent and alleging that Lighthouse had not complied with its obligation to pay

---

[9] Lighthouse had ceased paying rent to the power company beginning in August, 2000, even though it claimed that the lease remained in effect.

[10] The power company filed a motion to reargue pursuant to Practice Book § 11-12 on September 17, 2002, which the trial court denied on November 4, 2002. The power company did not challenge that ruling.

"all rental monies due." In fact, Lighthouse had not paid *any* back rent as of the date of the motion. On January 27, 2003, the trial court held a hearing on the matter. At the hearing, the power company acknowledged that it had waived its appellate rights with respect to the August 28 decision. The court then clarified that the order pursuant to the August 28 decision requiring Lighthouse to pay the power company "all rental monies due" was "mandatory." The court nonetheless advised Lighthouse: "You have all your remedies for damages, whatever [they are]. Give it to me in a [prejudgment remedy] and do all the rest of that. And meanwhile, I'm going to—I'm considering ordering that back rent to be paid. Get your [prejudgment remedy] in fast so that you can secure yourself in that regard. But if you don't pay the rent then what am I going to do about this—*that was the basis of one of the decisions.* And it has to be the basis of one of the mitigation findings. And there were concessions in court. I asked you a couple of times about it." (Emphasis added.)

On December 4, 2003, Lighthouse subsequently filed an application for prejudgment remedy in its civil action against the power company. Lighthouse sought to secure itself with respect to rent claimed due by the power company in connection with the declaratory judgment action, attorney's fees and costs and the non-refundable costs Lighthouse had incurred to acquire the ferry boat. The parties subsequently appeared before the court for a hearing on several issues, including the power company's motion for payment of back rent[11] and the application for prejudgment remedy.

On March 5, 2004, the trial court issued two memoranda of decision. In the first memorandum, the court

[11] It is undisputed that the unpaid rent owed by Lighthouse to the power company for the period beginning in August, 2000, and ending in January, 2003, was $393,749.96.

granted Lighthouse's application for prejudgment remedy on the ground that there was probable cause that Lighthouse would recover damages in its action against the power company. The court granted relief consisting of $420,000 for attorney's fees, $237,500 for costs incurred to acquire the ferry boat and $393,749.96 for rent owed to the power company pursuant to the lease from August, 2000, to January, 2003, which it rounded off to a total recovery of $1,050,000. The court, however, denied Lighthouse's request for relief as to future rent or rent abatement after January, 2003, leaving the parties to pursue their remedies under landlord/tenant law.

In the second memorandum on March 5, the court denied the power company's motion for payment of back rent because, in the first memorandum on that date, it had "granted to [Lighthouse] a [prejudgment remedy] equal to the unpaid rents of $393,749.96 for the period of August, 2000, to January, 2003." The court noted that "[t]he evidence submitted during the [prejudgment remedy] application was different than the evidence [the] court relied on in issuing the August 28 . . . decision." This new evidence included photographs and testimony regarding use of the property by the power company, evidence of the lockout by the power company and evidence that the power company had not cooperated with Lighthouse in the permitting process from August, 2000, to January, 2003.

On March 10, 2004, the power company appealed from the trial court's judgment in the declaratory judgment action, challenging the court's March 5, 2004 decision denying its motion for payment of back rent and the court's August 28 decision reinstating the lease. That same day, the power company also appealed from the trial court's judgment in the civil action, challenging the March 5, 2004 decision granting Lighthouse's application for prejudgment remedy. On March 16, 2004, Lighthouse filed a motion to dismiss the power com-

pany's appeal in the declaratory judgment action on the ground that the appeal was untimely, to the extent that it raised issues decided in the August 28 decision, because the power company had not brought an appeal within twenty days of that decision. On April 21, 2004, the Appellate Court denied the motion without prejudice and requested that the parties address the matter in their briefs to the court.

On January 10, 2005, the trial court issued articulations of its March 5, 2004 decisions.[12] The court explained, with respect to the prejudgment remedy decision, that one of the reasons behind its August 28 decision to reinstate the lease was that "[the power company had] negotiated a more lucrative deal for the [twenty-five acre parcel] with [Strand].[13] [The power company] needed [Lighthouse's sixty] day extension to gain the [l]andlord's right to terminate. [The power company] did not act in good faith in dealing with [Lighthouse] in obtaining the [sixty] day extension. At no time prior to termination did [the power company] inform [Lighthouse] of the Strand deal. [The power company] has unclean hands." (Internal quotation marks omitted.) The court further explained that the parties' failure to file an appeal challenging the August 28 decision supported the claim by Lighthouse for damages arising from the power company's termination of the lease. The court then declared that, despite the reinstatement of the lease and the power company's decision not to challenge the August 28 decision, the power company had violated the terms of the lease by locking Lighthouse out of the leased premises from August, 2000, to January, 2003, and by refusing to cooperate with

---

[12] The power company had filed two separate motions dated August 3, 2004, seeking articulations of the trial court's rulings in these matters.

[13] The power company negotiated with Strand for sale of the parcel after it had entered into the lease agreement with Lighthouse, which the power company was permitted to do under the terms of the lease.

Lighthouse in its attempt to obtain the required permits during that period. The court finally noted that, because the premises were available after January, 2003, for use by Lighthouse without further interference by the power company, "[t]he parties were 'left to their land-lord/tenant legal remedies'" with respect to relief sought by the power company for nonpayment of rent due after January, 2003. The court made the same obser-vations in its articulation of the decision denying the power company's motion seeking payment of back rent. On November 14, 2005, we transferred the consolidated appeal from the Appellate Court to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

I

On appeal, the power company claims that, in the declaratory judgment action, the trial court improperly: (1) reinstated the lease pursuant to the doctrine of equitable nonforfeiture; (2) denied its motion for pay-ment of back rent; and (3) acted as an advocate for Lighthouse when it recommended that Lighthouse assert a defense of equitable nonforfeiture. Lighthouse disagrees with each of these claims and argues, in turn, that the power company's appeal challenging the August 28 decision was untimely filed. We begin by addressing the timeliness of the appeal.

A

Lighthouse contends that the appeal should be dis-missed, insofar as it challenges the trial court's August 28 decision reinstating the lease, because the power company did not file its appeal until March 10, 2004, more than eighteen months later. The power company responds that the appeal should not be dismissed because the trial court's denial of the motion for pay-ment of back rent on March 5, 2004, constituted a mate-rial alteration of the earlier ruling, thus creating a new

appeal period. In the alternative, the power company argues that this court should consider the late appeal for good cause pursuant to our supervisory authority under our rules of practice. We agree with the power company's alternative claim that this court should consider the late appeal for good cause shown.[14]

Practice Book § 63-1 (a) provides in relevant part: "Unless a different time period is provided by statute, an appeal must be filed within twenty days of the date notice of the judgment or decision is given. . . ." The twenty day limitation, however, is not a "constitutionally or legislatively created condition precedent to the jurisdiction of [the appellate] court." (Internal quotation marks omitted.) *Dowling* v. *Slotnik*, 244 Conn. 781, 788, 712 A.2d 396, cert. denied sub nom. *Slotnik* v. *Considine*, 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998). The court, pursuant to its supervisory powers over the administration of justice, "may, on its own motion or upon motion of any party . . . order that a party for good cause shown may file a late appeal . . . ." Practice Book § 60-2 (6). Because the rules are intended "to facilitate business and advance justice, they [are to] be interpreted liberally in any case where

---

[14] The power company filed a motion for payment of back rent on January 13, 2003, seeking to enforce the terms of the August 28 decision, which the trial court had stated was an appealable final judgment. On March 5, 2004, the court denied the motion for payment of back rent and substantially modified the substantive terms of the underlying August 28 decision. If the motion for payment had been filed within four months of the August 28 decision, the substantial modification would have operated to open the judgment, thus creating a new appeal period. See *Commissioner of Transportation* v. *Rocky Mountain, LLC*, 277 Conn. 696, 706, 894 A.2d 259 (2006) ("we generally have deemed any action by the trial court that substantively modifies a judgment to be an opening of that judgment"); see also *Union & New Haven Trust Co.* v. *Taft Realty Co.*, 123 Conn. 9, 15, 192 A. 268 (1937); *Coxe* v. *Coxe*, 2 Conn. App. 543, 547–48, 481 A.2d 86 (1984). The motion was filed, however, more than four months after the August 28 decision. Consequently, the trial court lacked jurisdiction to open that judgment. See Practice Book § 17-4 (a) (court lacks power to open judgment unless motion to open is filed within four months of notice of judgment).

it shall be manifest that a strict adherence to them will work surprise or injustice." Practice Book § 60-1. Moreover, "we eschew . . . mechanistic interpretation[s] of our appellate rules in recognition of the fact that an unyielding policy requiring strict adherence to an appellate time limitation—no matter how severe or unfair the consequences—does not serve the interests of justice." (Internal quotation marks omitted.) *Alliance Partners, Inc.* v. *Voltarc Technologies, Inc.*, 263 Conn. 204, 213–14, 820 A.2d 224 (2003). Accordingly, the twenty day limitation in the rules of practice is not an absolute bar to the filing of a late appeal.

Nevertheless, timely motions to dismiss late appeals ordinarily are granted by the court. See id., 212–14 (affirming Appellate Court's exercise of discretion in dismissing untimely appeal). "This practice is based in part on the fact that if the untimely appeal is entertained, a delinquent appellant would obtain the benefit of the appellate process after contributing to its delay, to the detriment of others with appeals pending who have complied with the rules and have a right to have their appeals determined expeditiously. Appellees are given the right under our rules to object to the filing of a late appeal and should be given the benefit of that rule, *barring unusual circumstances* or unless they waive the benefit of that rule." (Emphasis added; internal quotation marks omitted.) Id., 213. In light of these principles, we therefore must decide whether the circumstances in the present case are "sufficiently exceptional to fall within the [court's] own limiting caveat." *Ramos* v. *Commissioner of Correction*, 248 Conn. 52, 61, 727 A.2d 213 (1999).

We conclude that, because exceptional circumstances gave rise to the power company's late appeal challenging the August 28 decision reinstating the lease, and because those circumstances were beyond the power company's control, its appeal should not be dis-

missed. The trial court's March 5, 2004 ruling on the motion for payment of back rent changed a fundamental premise of the decision reinstating the lease, namely, that Lighthouse was "willing to pay back rent" and, therefore, the power company would not "lose the benefit of its November 30, 1999 lease." The court emphasized that this element was central to its August 28 decision during the hearing on the motion in January, 2003. During that hearing, the court described the August 28 decision requiring Lighthouse to pay back rent as "mandatory" and as "the basis of one of the decisions." Consequently, when the court determined more than one year later that Lighthouse no longer was obligated to pay back rent, it fundamentally altered the original decision. See *Alliance Partners, Inc.* v. *Voltarc Technologies, Inc.*, supra, 263 Conn. 213–14.

Furthermore, the trial court decided the motion in a highly unorthodox manner. In its March 5, 2004 memorandum, the court stated that the evidence on which it had relied in reaching its decision "was *different* than the evidence [the trial] court relied on in issuing the August 28 . . . decision." (Emphasis added.) This evidence included testimony *at the prejudgment remedy hearing* on the power company's use of the property, its lockout at the premises and its failure to cooperate with Lighthouse in the permitting process from August, 2000 to January, 2003. The court also stated that a key consideration in its decision on the motion for payment of back rent was its granting of the application for prejudgment remedy, which included a sum equal to the unpaid rent. The court thus relied on findings in a proceeding that Lighthouse did not commence until more than fifteen months following issuance of the August 28 decision to effect a radical change in its earlier balancing of the equities between the parties. These developments were beyond the control of, and could not have been anticipated by, the power company

when the court issued the August 28 decision. See *Ramos* v. *Commissioner of Correction,* supra, 248 Conn. 61–62 (most significant factor in permitting late appeal was that delay could not be attributed to petitioner, but arose from specifically identified confusion in office of public defender); *State* v. *Stead,* 186 Conn. 222, 228, 440 A.2d 299 (1982) (key factor in permitting late appeal was that defendant had "become mired in a procedural bog largely created by his own counsel"). For the foregoing reasons, and because of the unusual procedural status of this case; see footnote 14 of this opinion; we conclude, pursuant to the exercise of our supervisory authority, that good cause has been shown for the filing of a late appeal by the power company challenging the trial court's August 28 decision reinstating the lease.

## B

We next consider whether the trial court properly reinstated the lease under the doctrine of equitable nonforfeiture.[15] Lighthouse argues that the trial court properly reinstated the lease on the ground that the power company wrongfully had induced Lighthouse to exercise the lease extension option. This is the same argument Lighthouse makes in its civil action against the power company. Lighthouse specifically contends

---

[15] The doctrine of equitable nonforfeiture is a defense implicating the right of possession that may be raised in a summary process proceeding, and is based on the principle that "[e]quity abhors . . . a forfeiture." (Internal quotation marks omitted.) *Fellows* v. *Martin,* 217 Conn. 57, 64–65, 584 A.2d 458 (1991). In deciding whether to grant equitable relief, the court first considers the nature of the lease violation involved. "[I]n cases of wilful or gross negligence in failing to fulfil a condition precedent of a lease, equity will never relieve. But in [a] case of mere neglect in fulfilling a condition precedent of a lease, which does not fall within accident or mistake, equity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease." *Fountain Co.* v. *Stein,* 97 Conn. 619, 626–27, 118 A. 47 (1922).

that article six did not require it to choose between terminating the lease or seeking a sixty day extension, but merely granted Lighthouse the *right* to make such a choice, and that it could have remained a tenant even without exercising the sixty day extension upon failing to obtain the required permits within the first 180 days. Lighthouse further argues that the power company wrongfully *induced* it to exercise the sixty day extension so that the power company would acquire the right to terminate the lease if Lighthouse did not satisfy the permit requirement within the next sixty days. Lighthouse suggests that the power company wanted to acquire this right because it was negotiating to sell the property to another party and termination of the lease would eliminate the cost of relocating the ferry service operation should the sale take place. Lighthouse thus argues that the power company did not act in good faith in urging it to exercise the sixty day extension and, accordingly, the trial court properly reinstated the lease under the doctrine of equitable nonforfeiture.

The power company responds that the plain language of article six establishes that the lease was contingent on Lighthouse obtaining the applicable governmental permits. Furthermore, the lease did not require the power company to inform Lighthouse of negotiations to sell the property during its tenancy. We agree with the power company that Lighthouse was obligated either to terminate or to extend the lease after the first 180 days should it fail to obtain the required permits and approvals. We therefore conclude that the trial court improperly reinstated the lease on the grounds that it was not contingent on obtaining the required permits and that the power company wrongfully had induced Lighthouse to exercise the lease extension option.

The trial court made the following findings in its August 28 decision: "The court finds that the lease was entered into by sophisticated parties, represented by

competent counsel regarding the commercial interests of both parties, each with relatively equal bargaining power. This court concludes that in article six 'the parties meant what they said and said what they meant in language sufficiently definitive to obviate any need for deference to the trial court's factual findings as to the parties' intent.' . . .

"Article six is titled 'Approvals' and does not contain a pure contingency clause. It does give either party the right to terminate if permits are not obtained but each party has different termination rights. . . .

"The court finds that article six of the lease gives the tenant alone the right to terminate the lease within and at the end of the 180 day period of time if the permits were not obtained. During that same 180 day period and at the end of the 180 days, the landlord has no right to terminate the lease, even if the permits are not obtained. Article six is not a pure contingency clause. The court concludes that the lease is not contingent on obtaining the governmental permits. The failure to obtain the permits only gives either the tenant and/or the landlord, under certain circumstances, the right to cancel the lease. Only when the tenant requests an extension of an additional 60 days, do both the tenant and the landlord have the right to terminate the lease. The tenant, on May 22, 2000, exercised the 60 day extension. . . . The 180 day period from November 30, 1999, ended at the conclusion of business on May 29, 2000. The 60 day extension thereafter, ended at the conclusion of business on July 28, 2000." (Citations omitted.) The court ultimately concluded that the lease had been terminated properly in accordance with article six, but found for Lighthouse on the fifth special defense and reinstated the lease under the doctrine of equitable nonforfeiture because the power company improperly had induced Lighthouse to extend the lease.

The applicable standard of review in contract interpretation cases is well established. "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . .

"Our case law, however, does not set forth a test by which to determine whether contract language is sufficiently definite to warrant its review as a question of law rather than as a question of fact. It is noteworthy that, in the majority of the cases considering contract interpretation a matter of law, the disputed agreement was a commercial contract between sophisticated commercial parties with relatively equal bargaining power." (Citations omitted; internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 495–96, 746 A.2d 1277 (2000).

The trial court in the present case found that "the lease was entered into by sophisticated parties, represented by competent counsel regarding the commercial interests of both parties, each with relatively equal bargaining power," and concluded, with respect to article six, that " 'the parties meant what they said and said what they meant in language sufficiently definitive to obviate any need for deference to the trial court's factual findings as to the parties' intent.' " In their respective briefs, both parties agreed that the determination of intent as expressed in the lease is a question of law. Our review is therefore plenary.

The intent of the parties as expressed in a contract "is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and

reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 498.

As previously noted, article six provides in relevant part: "[The] Tenant shall diligently proceed to obtain all governmental permits, approvals, licenses and/or certificates required in connection with Tenant's use of the Premises . . . .

"If Tenant has not obtained all such Permits within one hundred eighty days (180) days after the date of this Lease, then *Tenant shall have the right to either (i) terminate this lease or (ii) extend the contingency period for another sixty (60) days* . . . if Tenant exercises its right to extend the contingency period for an additional sixty (60) days, and if Tenant has not obtained all such Permits within the additional sixty (60) days, then Landlord and Tenant shall each have the right to terminate the lease by notice given to the other party within ten (10) days after the expiration of said sixty (60) day period." (Emphasis added.)

Webster's Third New International Dictionary defines the word "contingent" as "dependent on . . . or conditioned by something else . . . " and the word "either" as "the one and the other of the two . . . [or] the one or the other of the two." Construing the language

according to its ordinary meaning and usage, it is clear that the initial term of the lease was intended to be a "contingency period" subject to one of two choices by the tenant at the end of the first 180 days, these being "either" termination of the lease "or" extension of the lease for another sixty days should Lighthouse fail to obtain the applicable governmental permits and approvals. No third option, including continued occupation of the property by the tenant, can be read into the lease. Article six plainly provides that the tenant "shall diligently proceed to obtain all governmental permits" and other approvals needed in connection with the tenant's use of the property. If the lease was construed to mean that a tenant could continue to occupy the property after the first 180 days, even without obtaining the applicable permits and approvals, the due diligence provision would have no meaning. See *R.T. Vanderbilt Co. v. Continental Casualty Co.*, 273 Conn. 448, 462, 870 A.2d 1048 (2005) ("[w]hen interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result" [internal quotation marks omitted]).

Lighthouse argues that language stating that the tenant "shall have the right" to terminate or to extend the lease if it has not obtained the necessary permits and approvals within the first 180 days indicates that termination or extension of the lease are not the only options available to the tenant because a right is merely a power or privilege, rather than an *obligation,* to perform the designated act. Lighthouse thus contends that a third option of " 'doing nothing,' " or simply continuing to occupy the property, is available under the lease if the tenant has not obtained the permits and approvals within the specified time. We disagree.

Interpretation of the lease to include a third option of doing nothing would render superfluous the provision

granting either party the right to terminate the lease following exercise of the sixty day extension. Indeed, it is patently clear that there would be no reason for Lighthouse to seek an additional sixty days to obtain the required permits if it could ignore the 180 day deadline established in the lease. The option of doing nothing also flies in the face of article five of the lease, which describes the use to which the premises shall be put. Article five specifically provides: "The Premises *will* be used as a ferry service terminal including, without limitation, a parking lot, ticket office, terminal and dock for Tenant's vessels." (Emphasis added.) It is undisputed that a variety of permits are required to effectuate this use of the premises. Reading articles five and six together, as we are required to do; see *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, supra, 273 Conn. 462; leads to no other logical conclusion except that at the end of 180 days Lighthouse was required either to terminate the lease or to extend it. There was no third option of doing nothing.

We thus conclude that the trial court improperly reinstated the lease under the doctrine of equitable nonforfeiture. Under the express terms of the lease, Lighthouse would have been required to terminate the lease if it had not exercised the sixty day extension. In addition, Lighthouse concedes that it needed more time to obtain the applicable permits and approvals. As a result, it cannot be said that the power company wrongfully induced Lighthouse to extend the lease, and, therefore, equitable principles do not apply.

Lighthouse also argues that interpretation of the lease to mean that only two options are available after the first 180 days if the permits and approvals have not been obtained would render superfluous the provision that follows granting either party the right to terminate the lease at the end of 240 days. Lighthouse suggests that this would be the case because a consistent inter-

pretation of the lease would mean that, if the tenant is granted a right limited to choosing between extension or termination of the lease at the end of 180 days, the only alternatives expressed in the lease, then subsequent language granting either party the right to terminate the lease after 240 days must mean that the lease must be terminated if the permits are not obtained. This is so because termination is the only express option available to the parties at that point in time. We are unpersuaded.

As previously noted, contract language must be construed according to its ordinary meaning and sensibly applied to the subject matter of the contract. See *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 495–96. The right of either party to terminate the lease at the end of 240 days is not a requirement, as Lighthouse suggests, because the disputed language, when construed according to its ordinary meaning, clearly implies that the parties have a choice between terminating the lease and not terminating the lease. In contrast, the "either/or" language pertaining to termination or extension of the lease at the end of 180 days is explicit and implies no third choice. Additionally, granting each party the right to terminate the lease at the end of 240 days would have no meaning if the lease automatically terminated. Had the result suggested by Lighthouse been intended, the lease would have provided that the tenant's failure to obtain the applicable permits after 240 days would result in automatic termination of the lease.

Furthermore, the power company had no obligation under the lease to inform Lighthouse that it was negotiating with another party to sell the property because the lease expressly provided that the entire twenty-five acre parcel, which included the 3.6 acres leased to Lighthouse, would be marketed actively for redevelopment. There was no requirement that the power com-

pany inform Lighthouse of its negotiations with specific developers. Lighthouse, which was represented by competent counsel, had to be aware that the property could be sold at any time and that the lease contained no requirement that the power company inform Lighthouse of its negotiations in this regard.

Because we conclude that the trial court improperly reinstated the lease under the doctrine of equitable nonforfeiture, we need not reach the power company's claim that the trial court relied on the incorrect standard in granting equitable relief to Lighthouse. There is also no need to consider the power company's remaining claims that the trial court improperly denied its motion for payment of back rent and improperly acted as an advocate for Lighthouse, each of which rests on the presumption that the lease properly was reinstated.

II

The power company claims, in the civil action brought by Lighthouse, that the trial court improperly granted the application by Lighthouse for prejudgment remedy on the grounds that (1) the power company wrongfully induced Lighthouse to exercise the sixty day extension, and (2) the losses suffered by Lighthouse were proximately caused by the power company.[16] In addition, the power company argues that the trial court acted as an advocate for Lighthouse in recommending that Lighthouse file an application for prejudgment remedy. Because the trial court granted the prejudgment remedy on the basis of its determination that the power company wrongly had induced Lighthouse to extend the lease, we conclude, for all of the reasons previously

---

[16] The power company's appeal from the prejudgment remedy decision was filed timely pursuant to General Statutes § 52-278l (a), which provides that the granting or denial of a prejudgment remedy, following a hearing, is a final judgment for the purposes of appeal. Accordingly, the timeliness of the prejudgment remedy appeal is not an issue in this case.

articulated, that the trial court improperly granted the application for prejudgment remedy. Accordingly, we need not reach the issue of whether the trial court improperly acted as an advocate for Lighthouse.

The judgment in Docket No. SC 17552 is reversed and the case is remanded to the trial court with direction to render judgment for Connecticut Light and Power Company, except with respect to the motion for payment of back rent. The judgment in Docket No. SC 17553 is reversed and the case is remanded with direction to deny the application by Lighthouse Landings, Inc., for prejudgment remedy.[17]

In this opinion the other justices concurred.

---

[17] On remand, the trial court will be required to consider, in light of this decision, Lighthouse's claim for damages arising from the power company's alleged breach of lease, unfair trade practices, intentional misrepresentation, negligent misrepresentation and breach of the duty of good faith and fair dealing.