# CITY OF BRISTOL *v.* OCEAN STATE JOB LOT STORES OF CONNECTICUT, INC., ET AL.
## (SC 17819)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.*

---

\* The listing of justices reflects their seniority status as of the date of oral argument.

Argued April 12—officially released September 18, 2007

*Bridget C. Gallagher*, for the appellant (named defendant).

*Houston Putnam Lowry*, with whom, on the brief, was *Julie A. Morgan*, for the appellee (plaintiff).

ZARELLA, J. The named defendant, Ocean State Job Lot Stores of Connecticut, Inc.,[1] appeals[2] from the judgment of the trial court granting possession of the defendant's leasehold interest in a retail store in the Bristol Centre Mall (mall) to the plaintiff, the city of Bristol. The defendant claims that the trial court incorrectly concluded that the plaintiff properly had terminated the parties' lease. The defendant specifically claims that the plaintiff did not serve the defendant with a valid notice to quit the premises, thus depriving the trial court of subject matter jurisdiction. The defendant also claims that the plaintiff's termination of the defendant's lease was not in accordance with the lease's terms. We disagree and, accordingly, affirm the judgment of the trial court.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. The defendant operates a retail store in the mall pursuant to a lease agreement executed in July, 1993. The term of the lease originally was set to expire on January 31, 1999. The defendant subsequently exercised several options, extending the lease through January 31, 2014. In January, 2005, the plaintiff and the mall's owners initialed a draft statement of compensation as a first step toward the plaintiff's purchase of the mall. The plaintiff had determined that the property was ideally suited for several community uses such as public parking, a community theater, a municipal field house and a town square area.

---

[1] Although the plaintiff, the city of Bristol, named two other defendants in its original complaint, they are not parties to this appeal. In the interest of simplicity, we refer to Ocean State Job Lot Stores of Connecticut, Inc., as the defendant throughout this opinion.

[2] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Negotiations over the disposition of the mall stalled several times. On March 11, 2005, however, the plaintiff informed the mall's owners that it would ask various city boards to consider acquiring the mall and to begin formal condemnation proceedings. On March 14, 2005, the plaintiff, through its planning commission, adopted a resolution recommending the plaintiff's purchase of the mall. On March 18, 2005, the plaintiff's city council (council) and board of finance authorized the plaintiff, through its mayor, to purchase the mall for $5,299,000. The plaintiff purchased the property on March 21, 2005, and immediately sent the defendant notice, as required by the lease agreement, of the plaintiff's status as the successor landlord. On March 25, 2005, the plaintiff terminated the defendant's lease pursuant to § 17.1 of the lease agreement[3] and, on May 26, 2005, served notice on the defendant to quit the premises.

The defendant, however, refused to vacate the premises. The plaintiff then initiated this summary process action on June 8, 2005. The defendant filed a counterclaim, alleging violations of the implied covenant of good faith and fair dealing and the covenant of quiet use and enjoyment under the lease. On July 27, 2006, after a bench trial, the trial court rendered judgment for the plaintiff on the complaint and the defendant's counterclaim. The court determined that, because the intent of § 17.1 was to provide for the termination of the lease in the event of the mall's acquisition, the lease was subject to termination upon the plaintiff's purchase of the mall. The court further determined that termina-

---

[3] Section 17.1 of the lease agreement provides in relevant part: "If 10 [percent] or more of the [p]remises or 15 [percent] or more of the [mall] shall be acquired or condemned by right of eminent domain for any public or quasi public use or purpose, or if an [o]perating [a]greement is terminated as a result of such an acquisition or condemnation, [the] [l]andlord at its election may terminate this [l]ease by giving notice to [the] [t]enant of its election, and in such event rentals shall be apportioned and adjusted as of the date of termination. . . ."

tion of the lease was proper because the plaintiff had warned the defendant during the negotiation process that it could exercise the power of eminent domain if necessary. This appeal followed.

I

We first address the defendant's claim that the plaintiff failed to satisfy the jurisdictional requirements of a notice to quit. The defendant claims that the plaintiff's notice to quit failed to recite the reasons for terminating the lease and thus had been issued improperly. The plaintiff responds that the notice to quit satisfied the requirements of General Statutes § 47a-23. We agree with the plaintiff.

We begin our analysis with the applicable standard of review. A notice to quit is a condition precedent to a summary process action and, if defective, deprives the court of subject matter jurisdiction. See, e.g., *Lampasona* v. *Jacobs*, 209 Conn. 724, 728–29, 553 A.2d 175, cert. denied, 492 U.S. 919, 109 S. Ct. 3244, 106 L. Ed. 2d 590 (1989). "We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary. . . . Moreover, [i]t is a fundamental rule that a court may raise and review the issue of subject matter jurisdiction at any time." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Burton*, 282 Conn. 1, 6, 917 A.2d 966 (2007). Furthermore, "[s]ummary process is a special statutory procedure designed to provide an expeditious remedy. . . . It enable[s] landlords to obtain possession of leased premises without suffering the delay, loss and expense to which, under the common-law actions, they might be subjected by tenants wrongfully holding over their terms. . . . Summary process statutes secure a prompt hearing and final determination. . . . Therefore, the statutes relating to summary process must be narrowly construed and

strictly followed." (Citations omitted; internal quotation marks omitted.) *Young* v. *Young*, 249 Conn. 482, 487–88, 733 A.2d 835 (1999).

General Statutes § 47a-23 (a), which governs summary process actions, provides in relevant part: "When the owner or lessor . . . desires to obtain possession or occupancy of any land or building, any apartment in any building, [or] any dwelling unit . . . and (1) when a rental agreement or lease of such property, whether in writing or by parol, terminates for any of the following reasons: (A) By lapse of time; (B) by reason of any expressed stipulation therein . . . (E) nonpayment of rent when due for commercial property . . . or (3) when one originally had the right or privilege to occupy such premises but such right or privilege has terminated . . . such owner or lessor . . . shall give notice to each lessee or occupant to quit possession or occupancy of such land, building, apartment or dwelling unit . . . ." General Statutes § 47a-23 (b) also directs that a notice to quit shall include the reasons that the lessee or occupant must quit the premises, "using the statutory language or words of similar import . . . ."

In the present case, the notice to quit, dated May 26, 2005, ordered the defendant to quit the premises because the lease was being terminated for the following reasons: "(1) By lapse of time; (2) nonpayment of rent when due for commercial property; (3) by reason of any expressed stipulation therein; (4) when one originally had the right or privilege to occupy such premises but such right or privilege has terminated." All of these reasons are enumerated in § 47a-23 (a). Accordingly, we conclude that the notice to quit complied with the statutory requirements and formed a valid basis for the plaintiff's summary process action.

II

We next address the defendant's claim that the trial court incorrectly concluded that the plaintiff had termi-

nated the defendant's lease in accordance with its terms. The defendant claims that the trial court incorrectly determined that § 17.1 of the lease agreement permitted the plaintiff to terminate the lease upon its acquisition of the mall without establishing that the acquisition was made pursuant to the plaintiff's power of eminent domain. We disagree.

We begin our analysis with the applicable standard of review. The defendant's claim presents a question of contract interpretation because a lease is a contract, and, therefore, it is subject to the same rules of construction as other contracts. See *Middlesex Mutual Assurance Co.* v. *Vaszil*, 279 Conn. 28, 35–36, 900 A.2d 513 (2006). The standard of review for the interpretation of a contract is well established. "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]." (Internal quotation marks omitted.) *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 322, 885 A.2d 734 (2005). If "the language of [a] contract is susceptible to more than one reasonable interpretation, [however] the contract is ambiguous." (Internal quotation marks omitted.) *Poole* v. *Waterbury*, 266 Conn. 68, 96, 831 A.2d 211 (2003). Ordinarily, such ambiguity requires the use of extrinsic evidence by a trial court to determine the intent of the parties, and, because such a determination is factual, it is subject to reversal on appeal only if it is clearly erroneous. See id., 97. In the present case, even though there is a purported ambiguity in the lease agreement, no extrinsic evidence was offered at trial to establish the intent of the parties. Therefore, the trial court's determination of the parties' intent was based solely on the language of the lease agreement and did not involve the resolution of

any evidentiary issues of credibility. Accordingly, our review of the trial court's interpretation of the lease agreement involves a question of law over which our review is plenary.[4]

"In construing a written lease . . . three elementary principles must be [considered]: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; [and] (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible." (Internal quotation marks omitted.) *Middlesex Mutual Assurance Co.* v. *Vaszil*, supra, 279 Conn. 35–36. Furthermore, when "the language of the [lease] is clear and unambiguous, [it] is to be given effect according to its terms. A court will not torture words to import ambiguity [when] the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a [lease] must emanate from the language used in the [lease] rather than from one party's subjective perception of [its] terms." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Lighthouse Landings, Inc.*, 279 Conn. 90, 110, 900 A.2d 1242 (2006).

Section 17.1 of the lease agreement provides in relevant part: "If 10 [percent] or more of the [p]remises or 15 [percent] or more of the [mall] shall be acquired or condemned by right of eminent domain for any public or quasi public use or purpose . . . [the] [l]andlord at its election may terminate [the] [l]ease by giving notice to [the] [t]enant . . . ." We agree with the trial court

---

[4] We note that there was no evidence at trial as to whether the mall's prior owners or the defendant had drafted the lease agreement, and, therefore, the general rule of contract construction that ambiguities in a contract are to be construed against the drafter cannot be applied.

that the intent of § 17.1 "is to provide for the termination of the lease by the landlord" if certain conditions are met. This fact is not in dispute. At issue is the defendant's claim that "[t]he construction of the [foregoing provision] indicates that the term 'by right of eminent domain' qualifies the word 'acqui[red]'." Accordingly, the ultimate issue before the court is whether the conditions required to terminate the lease were satisfied when the plaintiff acquired the property by means other than condemnation.

We note that the defendant's construction of the relevant language in § 17.1, although plausible, is not the most reasonable construction of that provision. That is because reading the term "by right of eminent domain" to modify the term "acquired" results in an internal redundancy within the sentence in that the phrases "acquired . . . by right of eminent domain" and "condemned by right of eminent domain" both refer to the taking of private property by a governmental entity under its eminent domain power.

We conclude, for two reasons, that the better, and more plausible, construction of the language is to read the phrase, "by right of eminent domain," as modifying the word "condemned" only, and not the word "acquired." First, this interpretation of the agreement eliminates, in part, the redundancy that results from the defendant's interpretation because, rather than being synonymous with the word "condemned," the word "acquired" takes on a broader meaning to include real property that is obtained by other means, such as a purchase or gift, as well as condemnation. Second, this construction is more precise when one considers the legal definition of the term "condemned," which has at least two meanings under our legal parlance. For example, a municipality may condemn a building by declaring that it is unfit for use or human habitation without anticipating its acquisition. See, e.g., *Dukes* v.

*Durante*, 192 Conn. 207, 209, 471 A.2d 1368 (1984) (condemnation of dwelling units deemed "unsafe and unfit for human habitation"). A municipality also may condemn a building, however, for the express purpose of taking the property pursuant to its power of eminent domain. See, e.g., General Statutes § 48-12.[5] When the term "condemnation" is understood to mean the acquisition of property, it is accompanied by the phrase "by right of eminent domain" to distinguish the concept from condemnation for the purpose of declaring a building unfit for human habitation. Thus, the term "by right of eminent domain" appears to have been included in § 17.1 of the lease agreement to modify the word "condemned" because, without such a modifying term, § 17.1 could be read to grant the plaintiff a right to terminate the lease without any taking after deeming the mall unfit for use. We therefore construe the phrase "by right of eminent domain" as modifying the word "condemned" only, rather than both "condemned" and "acquired." In the absence of any other evidence of the intent of the parties to the lease agreement, we conclude that the trial court correctly determined that the lease contemplated that the landlord would retain the right to terminate the lease upon acquisition of the mall or a portion thereof for any public or quasi-public purpose *or* upon its condemnation of the mall or a portion thereof by eminent domain.

An examination of General Statutes § 48-6[6] supports the conclusion that a municipality may acquire property

[5] General Statutes § 48-12 provides: "The procedure for condemning land or other property for any of the purposes specified in sections 48-3, 48-6, 48-8 and 48-9, if those desiring to take such property cannot agree with the owner upon the amount to be paid him for any property thus taken, shall be as follows: The Comptroller in the name of the state, any town, municipal corporation or school district, or the trustees or directors of any state institution in the name of the state, shall proceed in the same manner specified for redevelopment agencies in accordance with sections 8-128, 8-129, 8-129a, 8-130, 8-131, 8-132, 8-132a and 8-133."

[6] General Statutes § 48-6 provides in relevant part: "(a) Any municipal corporation having the right to purchase real property for its municipal

for a public purpose without resorting to condemnation by right of eminent domain. Section 48-6 is part of a statutory scheme granting municipalities the power to exercise eminent domain over privately owned land. General Statutes § 48-6 (a) provides in relevant part that "[a]ny municipal corporation having the right to purchase real property for its municipal purposes which has, in accordance with its charter or the general statutes, voted to purchase the same shall have power *to take or acquire* such real property . . . and if such municipal corporation cannot agree with any owner upon the amount to be paid . . . it shall proceed in the manner provided by section 48-12 . . . ." (Emphasis added.) General Statutes § 48-12 authorizes the taking of property by eminent domain "for any of the purposes specified in [section] . . . 48-6 . . . *if those desiring to take such property cannot agree with the owner upon the amount to be paid him for any property thus taken* . . . ." (Emphasis added.) Section 48-6 therefore authorizes the use of condemnation pursuant to § 48-12 in the event that a municipality has approved the purchase of real property within its borders for a public purpose and negotiations regarding the purchase price for the property have been unsuccessful. The purpose of the statutory requirement that a municipality engage in bona fide negotiations with a property owner prior to condemnation, while simultaneously authorizing the same through a vote to acquire the property, is to encourage public entities to acquire property without resorting to litigation and to allow the property owner to receive fair compensation. *Atlantic City* v.

purposes which has, in accordance with its charter or the general statutes, voted to purchase the same shall have power to take or acquire such real property, within the corporate limits of such municipal corporation, and if such municipal corporation cannot agree with any owner upon the amount to be paid for any real property thus taken, it shall proceed in the manner provided by section 48-12 within six months after such vote or such vote shall be void. . . ."

*Cynward Investments*, 148 N.J. 55, 71, 689 A.2d 712 (1997); see *McKinney Independent School District* v. *Carlisle Grace, Ltd.*, 83 S.W.3d 205, 208, 210 (Tex. App. 2002).

We further conclude that the defendant's lease properly was terminated *even if* the lease agreement is construed to require termination of the lease pursuant to a condemnation by eminent domain. We reiterate the long-standing principle of contract interpretation that "[t]he intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Lighthouse Landings, Inc.*, supra, 279 Conn. 109. We conclude that § 17.1 of the lease agreement was intended to permit termination of the lease under circumstances in which the mall is acquired and the landlord was forced to sell under the threat of eminent domain[7] so that the property could be redeveloped for

[7] We note that this conclusion is consistent with the approach that a number of other jurisdictions have taken. See, e.g., *Western Airlines, Inc.* v. *Lathrop Co.*, 499 P.2d 1013, 1019–20 (Alaska 1972) (conveyance in lieu of actual condemnation akin to condemnation as it indicates intention to acquire property by condemnation and is tantamount to taking under power of eminent domain); *Peter Kiewit Sons' Co.* v. *Richmond Redevelopment Agency*, 178 Cal. App. 3d 435, 440–42, 223 Cal. Rptr. 728 (1986) (use of word "acquired" in lease termination provision does not explicitly limit process of acquisition to eminent domain proceeding and includes threat of such proceeding); *Dept. of Transportation* v. *Platolene "500", Inc.*, 33 Ill. App. 3d 470, 473, 337 N.E.2d 100 (1975) (holding that parties to lease agreement intended that *commencement* of condemnation proceedings would satisfy requirement that property be condemned in order to terminate lease agreement); *P.C. Management, Inc.* v. *Page Two, Inc.*, 573 N.E.2d 434, 437 (Ind. App. 1991) ("a conveyance in lieu of actual condemnation of real property constitutes a condemnation proceeding because it indicates an intention to acquire the property by condemnation and is tantamount to a taking under the power of eminent domain"); *Vincent* v. *Redevelopment Authority*, 87 Pa. Commw. 470, 473, 487 A.2d 1024 (1985) (provision that terminates lease upon condemnation proceeding is satisfied if property is acquired prior to, and under, threat of such proceeding).

a public purpose. The language of § 17.1 expressly provides that the landlord may terminate the lease if a certain percentage of the mall property is acquired "for any public or quasi public use or purpose . . . ." Thus, the provision clearly was intended to allow the termination of the lease when ownership of the property changes, with or without the landlord's or tenant's consent. In other words, unlike other commercial transactions in which a property owner sells the property and a tenant seeks some degree of continuity and protection through the lease agreement, the property owner has no power to guarantee that same continuity when the property is acquired for a public or quasi-public purpose. Accordingly, it is clear that § 17.1 was intended to allow the landlord to mitigate the risk of liability to the defendant by reserving the right to terminate the lease if it had been forced to sell the property to the government under the threat of condemnation by eminent domain.

As we previously indicated, the council and the board of finance authorized the plaintiff to purchase the mall for $5,299,000 on March 18, 2005. Pursuant to § 48-6, this vote authorized the plaintiff to exercise the power of eminent domain to condemn the mall within six months if the plaintiff and the owners of the mall could not agree on a purchase price. Although the plaintiff and the owners of the mall reached an agreement, and the plaintiff acquired the mall by purchasing it, the threat of condemnation was the principal reason for the sale. As a result, there is no discernible difference between the sale that actually occurred and the condemnation that might have occurred. One event transferred title through a deed whereas the other would have transferred title through a notice of condemnation pursuant to § 48-12.[8] In both instances, the threat of

---

[8] We note that the process for condemning land through the power of eminent domain does not require the condemning authority to initiate formal proceedings. Condemnations are governed by General Statutes § 8-129,

condemnation was the reason, or would have been the reason, for the plaintiff's acquisition. Accordingly, there is no practical difference between the plaintiff's acquisition of the property under the threat of condemnation and the plaintiff's condemnation of the property by eminent domain because both involve involuntary disposition of the property by the previous owners of the mall. We therefore conclude that the plaintiff "acquired" the mall within the meaning of § 17.1 of the lease agreement.

### III

The defendant's final claim is that the trial court incorrectly determined that the plaintiff properly terminated the lease pursuant to § 17.1 because the property was not acquired for a public or quasi-public purpose. We disagree.

This court recently has held that public use is generally defined as "public usefulness, utility or advantage, or what is productive of general benefit; so that any appropriating of private property by the state under its right of eminent domain for purposes of great advantage to the community, is a taking for public use." (Internal

which generally requires the condemning authority simply to "file a statement of compensation, containing a description of the property to be taken and the names of all persons having a record interest therein and setting forth the amount of such compensation, and a deposit . . . with the clerk of the superior court for the judicial district in which the property affected is located." In addition, a condemning authority must file that "statement of compensation and deposit . . . in the office of the town clerk of each town in which the property is located," and serve "notice . . . to each person appearing of record as an owner of [the] property affected . . . and to each person appearing of record as a holder of any mortgage, lien, assessment or other encumbrance on such property or interest therein . . . ." General Statutes § 8-129. After a return of service is filed with the Superior Court, a "certificate of taking" is then recorded in the office of the town clerk of the town in which the property is located. General Statutes § 8-129. Upon this recording, the "title to such property in fee simple shall vest in the municipality, and the right to just compensation shall vest in the persons entitled thereto." General Statutes § 8-129.

quotation marks omitted.) *Kelo* v. *New London,* 268 Conn. 1, 31, 843 A.2d 500 (2004), aff'd, 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005). Although "[a] public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences, changing conceptions of the scope and functions of government, and other differing circumstances brought about by an increase in population and new modes of communication and transportation. . . . Courts as a rule, instead of attempting judicially to define a public as distinguished from a private purpose, have left each case to be determined on its own peculiar circumstances. Promotion of the public safety and general welfare constitutes a recognized public purpose. . . . The modern trend of authority is to expand and liberally construe the meaning of public purpose. The test of public use is not how the use is furnished but rather the right of the public to receive and enjoy its benefit." (Internal quotation marks omitted.) Id., 35. Without attempting to provide a definition, it is fair to say that a public use may encompass a wide range of uses contemplated by a municipality for the general benefit of the public.

We conclude that the trial court correctly found that the plaintiff's acquisition of the mall had been for a public purpose. In its memorandum of decision, the trial court found that "the [plaintiff] determined that the property was ideally suited for community uses [such] as downtown space for a Boys and Girls Club, a community theater, additional surface and garage parking, a field house and a town square area . . . ." Under our broad definition of public use, it is clear that these uses are for the benefit of the community, which will have the ability to receive and enjoy them. We therefore conclude that the plaintiff properly terminated the defendant's lease pursuant to § 17.1 of the lease agreement.

The judgment is affirmed.

In this opinion the other justices concurred.

---

* The listing of justices reflects their seniority status on this court as of
the date of oral argument.