SPECIALIZED FREIGHT FORWARDERS *v.* DRAGONE
CLASSIC MOTORCARS, INC.
(AC 33768)

DiPentima, C. J., and Robinson and Mihalakos, Js.

Argued April 25—officially released August 28, 2012

*James M. Kearns*, for the appellant (defendant).

*Brenden P. Leydon*, for the appellee (plaintiff).

*Opinion*

ROBINSON, J. The defendant, Dragone Classic Motorcars, Inc., appeals from the judgment of the trial court in favor of the plaintiff, Specialized Freight Forwarders. On appeal, the defendant claims that the court (1) did not have subject matter jurisdiction over the case, (2) improperly determined that the plaintiff could recover against the defendant for shipping costs despite the fact that the term "freight collect" was used on the bill of lading[1] and (3) improperly determined that the plaintiff has recourse against the defendant for shipping charges incurred under the air waybill[2] when the plaintiff should have recouped those charges from the purchaser. We affirm the judgment of the trial court.

The trial court found the following facts. The plaintiff is a business based in the Netherlands that forwards freight internationally. The plaintiff was introduced to the defendant through the owner of the plaintiff, David Freriks, when Freriks was employed with another shipper, Mission Freight. During Freriks' employment with Mission Freight, he observed a series of shipping transactions between Mission Freight and the defendant, all of which involved the defendant paying euros for shipping services. Freriks later started Specialized Freight Forwarders and began shipping vehicles for the defendant, using the same arrangements as were used between Mission Freight and the defendant.

The plaintiff shipped five vehicles from the United States to Europe for the defendant in 2009. The invoices

[1] General Statutes § 42a-1-201 (6) defines a bill of lading in relevant part as "a document of title evidencing the receipt of goods for shipment issued by a person engaged in the business of directly or indirectly transporting or forwarding goods. . . ." "A bill of lading operates both as a receipt and as a contract. It is a receipt for the goods shipped and a contract to transport and deliver them." 13 Am. Jur. 2d 739–40, Carriage of Property § 319 (2009).

[2] Black's Law Dictionary (6th Ed. 1990) defines an airbill as "[a] document serving for air transportation as a bill of lading does for marine or rail transportation, and includes an air consignment note or air waybill."

provided to the court demonstrate that a 1929 Alfa Romeo was shipped by air and that a 1915 Metz, a 1932 Chrysler, a 1908 Buick and a 1932 Lincoln were shipped by ocean freight from New York City to the Netherlands. The business relationship between the parties deteriorated after the defendant failed to pay for the shipment of these vehicles. The plaintiff filed this action on July 12, 2010, and filed an amended complaint on August 10, 2010, alleging that it had not been paid for the services rendered to the defendant and that the defendant was unjustly enriched as a result.

A two day bench trial was held on July 14 and July 15, 2011. The court heard testimony from only Freriks and the defendant's president, Emanuel G. Dragone.[3] At the conclusion of trial, the court issued an oral decision finding in favor of the plaintiff. The court determined that it was understood between the parties that payment was to be made in euros and that the plaintiff was to determine the fees and expenses associated with the shipment of goods and notify the defendant of the itemized value and total amount prior to making actual shipping arrangements. The court determined that this procedure was the "usual and customary way that all shipping arrangements were handled by the parties" and that the plaintiff would advance all sums for the shipment and would be reimbursed for all such advancements by the defendant. The court further determined that despite the defendant's argument that the buyer of the vehicles was responsible for shipping fees, that was not the arrangement that the parties had used in the past. The court, therefore, awarded the plaintiff €26,560.59, plus prejudgment interest under General Statutes § 37-3a, for a total of €33,138.45, which converted to $46,877.60. The court also ordered legal interest of 8 percent to be paid from the date of the

---

[3] Dragone was out of the country when the trial took place and testified via a prerecorded videotaped deposition.

judgment until the unsatisfied amounts have been paid. This appeal followed.

I

The defendant's first claim on appeal is that the trial court did not have subject matter jurisdiction over the plaintiff's case because it is an admiralty action over which the federal courts have exclusive jurisdiction. "A determination regarding a trial court's subject matter jurisdiction is a question of law and, therefore, we employ the plenary standard of review and decide whether the court's conclusions are legally and logically correct and supported by the facts in the record. . . . [I]t is well established that a reviewing court properly may address [subject matter jurisdiction] claims that neither were raised nor ruled on in the trial court. Indeed, [o]nce the question of lack of [subject matter] jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented. . . . The court must fully resolve it before proceeding further with the case." (Citation omitted; internal quotation marks omitted.) *Warner* v. *Bicknell*, 126 Conn. App. 588, 594, 12 A.3d 1042 (2011).

The defendant argues that the federal courts have exclusive jurisdiction over admiralty actions under the constitution of the United States[4] and federal law, and, that therefore the court lacked subject matter jurisdiction. Section 1333 of title 28 of the United States Code provides: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which

---

[4] Article three, § 2, of the constitution of the United States provides in relevant part: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . to all Cases of admiralty and maritime Jurisdiction . . . ."

they are otherwise entitled. (2) Any prize brought into the United States and all proceedings for the condemnation of property taken as prize."

In its brief, the plaintiff cites *Madruga* v. *Superior Court*, 346 U.S. 556, 74 S. Ct. 298, 98 L. Ed. 290 (1954), in support of its argument that the court had subject matter jurisdiction. We find *Madruga* is dispositive of the defendant's claim. In *Madruga*, the United States Supreme Court stated: "Admiralty's jurisdiction is 'exclusive' only as to those maritime causes of action begun and carried on as proceedings *in rem*, that is, where a vessel or thing is itself treated as the offender and made the defendant by name or description in order to enforce a lien. . . . It is this kind of *in rem* proceeding which state courts cannot entertain. But the jurisdictional act does leave state courts 'competent' to adjudicate maritime causes of action in proceedings '*in personam*,' that is, where the defendant is a person, not a ship or some other instrument of navigation." (Citation omitted; emphasis in original.) Id., 560–61; see *In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 102 (2d Cir. 2005) ("[T]he jurisdiction of the federal admiralty courts has never been wholly exclusive. State courts, for example, may exercise *in personam* jurisdiction over litigants to provide remedies to causes of action that are cognizable under both admiralty and state law." [Emphasis in original.]); *Dluhos* v. *Floating & Abandoned Vessel*, 162 F.3d 63, 71 (2d Cir. 1998) ("[i]t is well-established that a claim may be cognizable under both federal admiralty law and state law"). In the present case, neither the plaintiff nor the defendant was a ship or other instrument of navigation. The proceeding, therefore, was in personam, and the trial court had subject matter jurisdiction to adjudicate the plaintiff's claims.

II

The defendant's second claim on appeal is that the court improperly determined that the plaintiff could

recover against the defendant for shipping costs despite the fact that the term "freight collect"[5] was used on the bill of lading. The defendant argues that the use of the term "freight collect" on the bill of lading demonstrated that only the buyer of the goods was to pay for shipping costs, not the seller, and, therefore, it should not be liable for the costs incurred in shipping the vehicles overseas. We disagree.

Whether the use of the term "freight collect" in the bill of lading meant that the buyer and not the seller organizing the shipment of the goods was responsible for shipment costs is a matter of contract interpretation. "The standard of review for the interpretation of a contract is well established. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]." (Citation omitted; internal quotation marks omitted.) *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7, 931 A.2d 837 (2007).

The defendant contends that the use of the term "freight collect" in the bill of lading demonstrates that it is not responsible for the shipment costs, and rather, that the plaintiff should have recouped those costs from the buyer of the transported goods. One decision of our Supreme Court has commented on the issue of

---

[5] Conflicting testimony was presented before the trial court as to what the term "freight collect" means in the shipping business. Neither party presented expert testimony on the meaning of the term. Freriks testified: "Freight collect means that the steamliner will collect the transport charges for me, for my company. So, I pay the steamliner for the transport charges. So, as soon as the container arrives [at its destination] . . . we need to pay . . . the steamliner." Dragone testified that freight collect means that the "the buyer or the person that's receiving the container pays the charges."

whether the term "freight collect," in and of itself, demonstrates that the buyer and not the seller who organized shipment of the goods is responsible for freight costs. In *New York, New Haven & Hartford Railroad Co.* v. *California Fruit Growers Exchange*, 125 Conn. 241, 243, 5 A.2d 353, cert. denied, 308 U.S. 567, 60 S. Ct. 79, 84 L. Ed. 476 (1939), the defendant seller shipped a carload of fruit with the plaintiff carrier from California, consigned to itself at Providence, Rhode Island. After the fruit arrived in Rhode Island, the defendant directed the carrier to deliver the fruit to Shore Brothers, Inc., " 'on payment of freight and all other charges.' " Id. The carrier delivered the fruit to Shore Brothers, Inc.; however, the carrier did not collect the freight costs. Id. After Shore Brothers, Inc., became insolvent, the carrier sued the defendant to recover the cost of shipping the fruit. Id. In reaching its conclusion that the defendant was to pay for the shipping costs, our Supreme Court commented: "In *New York Central [Railroad] Co.* v. *Frank H. Buck Co.*, [2 Cal. 2d 384, 392, 41 P.2d 547 (1935)], upon facts similar in all material respects to those of the present case, the consignor was held liable for freight charges, it being said . . . : The authorities . . . hold without exception, so far as we are advised, that a mere direction by a consignor or consignee liable for the freight that a shipment be carried or diverted freight collect or delivered upon payment of freight, or the like, is insufficient to relieve him of such liability, citing numerous cases, including *New York Central [Railroad] Co.* v. *Warren Ross Lumber Co.* [234 N.Y. 261, 137 N.E. 324 (1922)] and other cases hereinafter referred to. The consignor is primarily liable even where the bill of lading contains a provision imposing liability upon the consignee. *Louisville & [Nashville Railroad Co.]* v. *Central Iron & Coal Co.*, 265 U.S. 59, [44 S. Ct. 441, 68 L. Ed. 900 (1924)]." (Citation omitted; internal quotation marks omitted.) *New York,*

*New Haven & Hartford Railroad Co.* v. *California Fruit Growers Exchange,* supra, 248.

Other courts have also determined that the use of the term "freight collect" does not necessarily absolve the party ordering the goods to be shipped of liability for payment of shipping costs. The United States Supreme Court in *Louisville & Nashville Railroad Co.* v. *Central Iron & Coal Co.*, supra, 265 U.S. 67, stated: "Ordinarily, the person from whom the goods are received for shipment assumes the obligation to pay the freight charges; and his obligation is ordinarily a primary one. This is true even where the bill of lading contains . . . a provision imposing liability upon the consignee. For the shipper is presumably the consignor; the transportation ordered by him is presumably on his own behalf; and a promise by him to pay therefor is inferred (that is, implied in fact), as a promise to pay for goods is implied, when one orders them from a dealer." See *Flota Mercante Grancolombiana* v. *Florida Construction Equipment, Inc.*, 608 F. Sup. 1515, 1524–25 (E.D. La. 1985) ("There is a rebuttable presumption that the shipper is primarily liable for freight. This presumption may be rebutted by proof, by the bill of lading or other evidence, that the parties intended that the consignee should assume the primary liability and the shipper should assume only a secondary liability, or that the consignee should assume the liability entirely and the shipper should not assume any liability whatsoever for payment of the freight charges. The clause 'freight collect', of itself, on the bill of lading is insufficient to rebut the presumption and relieve the shipper of its primary liability to pay the freight.").

In the present case, the defendant's sole argument in regard to this issue is that the use of the term "freight collect" on the bill of lading established that the purchasers of the vehicles were responsible for shipping costs, and not the defendant. As the case law outlined

previously demonstrates, however, the use of the term "freight collect" on the bill of lading does not necessarily absolve the party ordering the shipment of goods, i.e., the shipper, of its liability to pay the shipping costs. The defendant does not argue that the court erred in concluding that the parties engaged in a course of conduct that involved the plaintiff advancing funds to pay for shipping the defendant's goods and the defendant, in turn, reimbursing the plaintiff for such costs. Because the defendant does not challenge this portion of the court's decision, and we conclude that the term "freight collect," in and of itself, does not absolve the defendant of liability for shipping costs, we conclude that the court did not err in holding the defendant liable for the shipping costs in question.

III

The defendant's last claim on appeal concerns the Alfa Romeo shipped by air transportation. The defendant claims that the court improperly determined that the plaintiff could recover shipping costs incurred under the air waybill from the defendant because the plaintiff was informed that the goods were to be delivered to a specific buyer, who, in turn, should have been responsible for such costs. The defendant argues that although the Alfa Romeo originally was to be shipped to an auction in Paris and then returned to the United States, prior to the vehicle leaving the United States, the defendant sold the car to a buyer in Italy. Therefore, the defendant argues, the shipping costs and the value added tax or VAT[6] should have been paid by the purchaser and not the defendant.[7]

---

[6] In the present case, a VAT of $6000 was paid by the plaintiff when the Alfa Romeo was shipped overseas. Freriks testified that the VAT is an import duty that in this case was "the value of the car multiplied . . . [by] 6 percent . . . ."

[7] We note that the defendant also argues that the air waybill submitted as an exhibit was not genuine because it was not Dragone's signature on the document. Besides its blanket assertion that "[a]ny reasonable inspection of the exhibit indicates that the signature of Dragone Classic Motorcars is

The court's determination that the defendant did not effectively notify the plaintiff of the alleged change in the shipment of the Alfa Romeo and, therefore, was liable for the shipping costs is a question of fact subject to the clearly erroneous standard of review. See *Reiner, Reiner & Bendett, P.C.* v. *Cadle Co.*, 278 Conn. 92, 107, 897 A.2d 58 (2006). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence . . . we give great deference to its findings." (Internal quotation marks omitted.) Id.

In the court's memorandum of decision, it found the following: "Furthermore, the court concludes that the defendant's claim that—that he sold the Alfa Romeo to an identified person and notified the plaintiff of same by e-mail before the vehicle was sent to France in accord with the original agreement, rather than to Italy, as unsupported by the . . . evidence. The defendant was given an opportunity to furnish documentation of this information, but failed to offer any evidence on the subject, which fact—adversely affects his credibility with regard to the sale of the vehicle before it was delivered to the auction house. It is also incredible that he would change the deal in the middle of the transaction without first notifying the plaintiff. Consequently, the court finds for the reasons stated herein

not genuine," however, the defendant sets forth no further analysis regarding its argument. "[W]e are not required to review claims that are inadequately briefed . . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Internal quotation marks omitted.) *Russell* v. *Russell*, 91 Conn. App. 619, 634–35, 882 A.2d 98, cert. denied, 276 Conn. 924, 925, 888 A.2d 92 (2005).

that the defendant did not effectively notify the plaintiff of any change and is therefore obligated to pay the invoice price, which includes the out-of-pocket advances by the plaintiff as contemplated under their standard business arrangement as I've forth set."

The evidence presented to the court concerning the air waybill and the alleged change in the shipping plans almost entirely conflicted. Dragone testified at trial that the two air waybills submitted as exhibits were different documents because on one copy someone tried to block out his name. The defendant argued that Dragone's name was blocked out on the air waybill because he no longer was the consignee, and this, therefore, demonstrated that the vehicle had been sold. Freriks, in turn, testified that the first copy of the air waybill was the draft that was sent by e-mail to the plaintiff by the issuing carrier, Cosdel International Transportation, of what the air waybill would look like when the shipment was finalized and that the second copy is the actual air waybill that was sent with the vehicle overseas. The plaintiff's counsel also argued that the name Dragone was not blocked out on the document, rather, the document was a carbon form, and there are certain portions on the document that are grey.[8]

The remainder of the evidence concerning the shipment of the Alfa Romeo involved only Freriks and Dragone's testimony. Freriks testified that he was not aware of any change in shipping arrangements and that the vehicle was shipped to Paris as originally planned. Dragone, in turn, testified that the arrangements were changed after the vehicle was shipped. Due to the conflicting evidence and the fact that only Freriks and Dragone testified, the court was left to gauge the credibility of the two witnesses in order to render its decision. In its oral decision, the court explicitly found that

[8] The court noted that neither party had presented the court with a blank copy of an air waybill.

it believed Freriks' testimony concerning payment over that of Dragone.[9] "[I]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . As such, the trial court is free to accept or reject, in whole or in part, the evidence presented by any witness, having the opportunity to observe the witnesses and gauge their credibility." (Internal quotation marks omitted.) *State* v. *Miller*, 122 Conn. App. 631, 635, 999 A.2d 844 (2010). Based on the conflicting evidence provided by both the plaintiff and the defendant, we cannot conclude that the court's finding that the defendant did not notify the plaintiff of the alleged change in the shipment of the Alfa Romeo was clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[9] As previously noted, the court stated that "[t]he defendant was given an opportunity to furnish documentation of this [concerning the sale of the Alfa Romeo], but failed to offer any evidence on the subject, which fact—adversely affects his credibility with regard to the sale of the vehicle before it was delivered to the auction house." Furthermore, the court noted that it "believes the plaintiff's testimony of the conversations with Dragone about the payment of matters rather than the defendant's."