******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BRENT PLATT, TRUSTEE OF THE VIRGINIA
D'ADDARIO SPRAY TRUSTS *v.* TILCON
CONNECTICUT, INC.
(AC 41735)

Prescott, Bright and Moll, Js.

*Syllabus*

The plaintiff, trustee of the V Trust, sought to recover damages from the
defendant asphalt production company for, inter alia, breach of contract
for the defendant's failure to remit rental payments in accordance with
two lease agreements. In May, 1974, the defendant's predecessor in
interest entered into separate, twenty year leases with D for two asphalt
production plants. The leases were set to expire on December 31, 1993,
but provided for an opportunity to extend the terms of the leases. As
trustee, the plaintiff owns a 12.5 percent interest in both plants. Trusts
for three other individuals each own 12.5 percent and the estate of D
owns 50 percent for a total of 87.5 percent interest in the plants. In
1993, the holders of the 87.5 percent interest agreed to amend the leases
with the defendant to reduce the amount of rent. The plaintiff did not
agree to the amendments. On April 1, 1993, the holders of the 87.5 percent
interest executed amendments to the two leases. The amendments made
clear that the plaintiff's 12.5 percent interest was not a part of the
agreement. After execution of the amendments, the plaintiff considered
the defendant a holdover tenant. The defendant continued to remit rental
payments to the plaintiff, calculated pursuant to the lease amendments
rather than the original lease agreements. The plaintiff accepted and
deposited these payments. The defendant twice exercised its rights to
extend the amendments to the leases for an additional ten years but
did not do so with respect to the plaintiff's 12.5 percent interest. The
plaintiff's breach of contract claims were based on the defendant's
failure to remit rental payments for the plants in accordance with the
terms of the original leases. The trial court found in favor of the defen-
dant, concluding that the original leases expired on December 31, 1993,
and, thus, the plaintiff could not prevail on his breach of contract claims.
On appeal, the plaintiff claimed, inter alia, that the trial court improperly
concluded that the original leases expired on December 31, 1993. *Held*
that the trial court properly concluded that the plaintiff could not prevail
on his breach of contract claims because the original leases expired on
December 31, 1993, and the plaintiff and the defendant did not form an
agreement to extend the terms of the original leases beyond the expira-
tion of the primary term; the defendant did not exercise the option to
extend the original lease terms with respect to the plaintiff's 12.5 percent
interest, the defendant's rent payments, after the expiration of the origi-
nal leases' primary terms, were formulated commensurate with the
provisions of the lease amendments, supporting the conclusion that
the original leases were no longer enforceable contracts between the
plaintiff and the defendant and the defendant held over, creating a
month-to-month tenancy with the plaintiff's 12.5 percent interest in
the plants.

Argued December 11, 2019—officially released March 24, 2020

*Procedural History*

Action to recover damages for, inter alia, breach of
contract, and for other relief, brought to the Superior
Court in the judicial district of New Britain and tried
to the court, *Wiese, J.*; judgment for the defendant, from
which the plaintiff appealed to this court. *Affirmed.*

*F. Dean Armstrong*, pro hac vice, with whom was
*Edward C. Taiman, Jr.*, for the appellant (plaintiff).

*Kevin J. McEleney*, with whom were *Matthew K.*

*Stiles*, and, on the brief, *Christopher A. Klepps*, for the appellee (defendant).

*Opinion*

MOLL, J. The plaintiff, Brent Platt, in his capacity as Trustee of the Virginia D'Addario Spray Trusts (VST),[1] appeals from the judgment of the trial court rendered in favor of the defendant, Tilcon Connecticut, Inc., on, inter alia, two counts of breach of contract.[2] On appeal, the plaintiff claims that the trial court erred by (1) concluding that the original leases between the parties expired on December 31, 1993, (2) determining that the plaintiff's breach of contract claims were barred by the statute of limitations, and (3) concluding that the plaintiff's breach of contract claims also were barred by the doctrine of res judicata. We conclude that the trial court properly determined that the original leases expired in 1993, and, as a result, the plaintiff could not prevail on his breach of contract claims.[3] Accordingly, we affirm the judgment of the trial court.

The trial court's comprehensive memorandum of decision sets forth the following findings of fact that are relevant to our resolution of this appeal.[4] "The plaintiff . . . is the successor trustee of the [VST]. Virginia D'Addario is the VST's sole beneficiary. . . . In May, 1974, Virginia D'Addario's father, F. Francis D'Addario (Mr. D'Addario), owned two asphalt production plants (plants). The plants are located in Danbury and Newtown. On May 13, 1974, Mr. D'Addario, as landlord, and Ashland Oil, Inc. (Ashland Oil), as tenant, entered into separate leases for the two plants (original leases). . . . [The defendant] is the successor in interest to Ashland Oil and is the tenant for the two plants located in Danbury and Newtown. . . . [The defendant] is the largest producer of asphalt in the United States. . . .

"In 1976, Mr. D'Addario conveyed fractional interests in the two plants aggregating 50 percent to the 'Spray Trusts' that Mr. D'Addario established for the benefit of his then living children, David, Larry, Marylou, Lisa, and Virginia D'Addario. Mr. D'Addario retained 50 percent interest to himself. In 1990, Lisa D'Addario died and her fractional interest vested in the Spray Trusts of her remaining four siblings. The Spray Trusts for each of Mr. D'Addario's four surviving children, David, Larry, Marylou, and Virginia now each own 12.5 percent of the Danbury and Newtown plants . . . . Mr. D'Addario died on March 5, 1986. From 1986 to the present, the estate of Mr. D'Addario (estate) has owned 50 percent interest in the plants. The estate remains open and pending. . . .

"The original leases . . . are dated May 13, 1974. The term of the Danbury lease was for 'twenty (20) years, beginning on the first day of the calendar month immediately following the month in which erection of the asphalt plant on the premises is accomplished . . . .' The term of the Newtown lease was specified as 'for twenty (20) years beginning on January 1, 1974 and

ending on December 31, 1993 . . . subject to earlier termination or further extension . . . .' Briefly stated, and as is relevant to the present dispute, the rent for the original leases was calculated as 'the sum of [15] percent of the gross sales price of each ton of bituminous concrete produced and sold by lessee from the operation of the asphalt plant located on the premises.' . . .

"Pursuant to the terms of the original leases, Ashland Oil and its successor, [the defendant], were granted the option to extend the initial twenty year terms for an additional three ten year periods. If the lessee elected to exercise the options to extend the leases, it was required to provide written notice to the lessor not less than one year prior to the expiration of the preceding term. The original leases provided that, '[i]n the event any of said options are exercised, said extended term or terms shall be upon all of the same terms and conditions . . .' of the original leases. This would include the specified rent based upon 15 percent of the gross sale price of each [ton of] bituminous concrete produced and sold. Pursuant to the terms of the original leases, [the defendant] had the right and obligation to purchase the plants if it chose not to exercise the option to extend the leases. Unless purchased earlier, [the defendant] had the obligation to purchase the plants at the end of the final term in 2024. The purchase price would be calculated as the fair market value pursuant to the process set forth in the original leases. . . . The original leases specified that there could not be any 'amendment, modification, or waiver . . .' from the terms of the lease unless it was in writing and signed. . . .

"From prior to 1993, through 1999, Stanley Ferber, as VST's trustee, was 12.5 percent owner of the plants. Since approximately 1999, [the plaintiff], as VST's trustee, is 12.5 percent owner of the plants. At all relevant times to date, Nicholas Vitti has been the trustee for the Spray Trusts in favor of David, Larry, and Marylou D'Addario, and in his capacity as trustee he owns 37.5 percent interest in the plants. . . . From 1986 to date, the estate has owned 50 percent of the plants. The current executors of the estate are David and Larry D'Addario. . . . The trusts of these individuals, along with the estate, are the plants' owners.

"Through letter dated January 19, 1993, [the defendant], through its attorney, notified the landlords that it intended to purchase the plants. The letter identified an appraiser retained for the purpose of determining fair market value of the plants. . . . This occurred prior to the expiration of the original leases. . . . Pursuant to the original leases, it was [the defendant's] absolute right to purchase the plants. There was no requirement under the original leases that [the defendant] obtain the landlords' consent prior to purchasing the plants.

"In 1993, [the defendant] was prepared to exercise its right to purchase the plants and had engaged an appraiser. . . . On or about the time that [the defendant] made the notification of purchase, David D'Addario met with Angelo Tomasso. . . . Angelo Tomasso had participated along with Mr. D'Addario in the drafting of the original leases' terms. Mr. D'Addario and Tomasso had a long-standing personal and business relationship. David D'Addario indicated to Angelo Tomasso that he represented all of the D'Addario family landlords, with the exception of Virginia D'Addario, and they did not want to sell the plants. . . . Instead, they wanted the leases renewed. . . . Angelo Tomasso wanted a reduction in the rent, because it was no longer economically feasible to pay the rent specified in the original leases. The price of liquid asphalt had substantially increased, thus, reducing the profit margin in the finished product produced. Angelo Tomasso was very much aware of the fact that the VST's 12.5 percent interest did not agree with what was being requested of [the defendant]. . . . David D'Addario informed Angelo Tomasso that if there was a problem with the VST, he would handle it. . . .

"Angelo Tomasso contacted Virginia D'Addario in the spring of 1993, by telephone. He asked her if she would consent to an amended lease containing a reduced rent. She told him that she would not consent. This discussion took place prior to the lease amendments being signed. In a letter dated January 14, 1993, Allan Cane, the attorney for the VST, notified the trust landlords and other interested individuals 'that this is a formal notice that the [VST] elects not to renew the lease under the terms expressed by David D'Addario, at this time.' . . . The reference in the letter to 'under the terms expressed' was to a proposal to reduce the rent on the plants.

"In a letter dated January 29, 1993, Lawrence Schwartz, the attorney for Vitti and the estate of Mr. D'Addario, wrote to [the defendant]. He advised [the defendant] that his clients owned 87.5 percent of the plants and that to his clients' 'dismay and surprise,' they learned that the VST does not want to renew the leases. . . . He indicated that the owners of the 87.5 percent are willing to renew the leases 'along the lines of the discussions that David D'Addario has had with Tomasso and request you disregard the communication from Virginia D'Addario's attorney.' . . . The attorney concluded his remarks by stating, 'it is only a [12.5 percent] ownership that is in dispute and that the other owners will clean this matter up on their own.' . . . On February 15, 1993, the attorney for VST wrote a letter to [the defendant's] attorney inquiring as to [the defendant's] intentions regarding the plants. . . . He stated, '[a]t this time, my client would like to know the present status of your intentions as the [e]state has since

advised us on January 29, 1993, that it would be attempting to buy my client out or seek partition . . . and then extend the existing lease.' . . . [The defendant's] attorney responded by letter dated February 18, 1993, and stated, '[t]his is to advise you that my client is proceeding with entering into a lease extension with the Trustee and the [e]state [87.5 percent].' . . . In response, VST's attorney wrote in the March 1, 1993 letter, that [the defendant] 'at least in regard to [VST] . . . is waiving and relinquishing any right to purchase [the plants]' and would be considered a holdover tenant. . . .

"On April 1, 1993, David D'Addario, Lawrence D'Addario, and Albert Paolini (as coexecutors of the estate), and Vitti, as trustee of the Spray Trusts of David, Larry, and Marylou D'Addario, executed an amendment to lease for the Danbury Asphalt Plant. . . . On July 1, 1993, David D'Addario, Lawrence D'Addario, and Albert Paolini (as coexecutors of the estate), and Vitti as trustee for the Spray Trusts of David, Larry, and Marylou D'Addario, executed an amendment to lease for the Newtown Asphalt Plant. . . . Ferber, then trustee for the VST, did not execute the amendments to the Danbury or Newtown plant leases.

"The Danbury and Newtown 'Amendment to Lease' provides in relevant part: 'The [e]state [of Mr. D'Addario] and Vitti are involved in an owners' dispute with the . . . [VST] concerning the lease and related issues.' . . . 'The parties hereto now desire to amend and extend the lease as provided hereafter. NOW THEREFORE, the parties hereto agree that all of the terms and conditions of the lease shall remain in full force and effect subject only to the following specific amendments which shall be incorporated into and become part of the lease.' . . . Among the provisions of the original leases amended was the lease term. In the lease amendments, it was specified that the 'primary term' commenced on April 1, 1975, and terminated on December 31, 2004. . . . The method for calculating rent was also substantially altered. . . . The net result of the amendments pertaining to rent was a reduction in the amount paid to the landlords.

"The amendment to the original leases included a 'Quiet Enjoyment' provision, which provided: 'The parties acknowledge that the estate and Vitti represent only 87.5 percent of the landlord's interest in the Premises and that [*VST*] *is not a party to this amendment to lease.* [The estate of Mr. D'Addario] and Vitti hereby, jointly and severally, indemnify and agree to defend and hold Tenant harmless from and against any and all loss, cost, liability and expense, including without limitation reasonable attorneys' fees, incurred by Tenant and arising out of or in any way connected with the Owners' dispute or any challenge to the enforceability of this amendment to lease. [The estate of Mr. D'Ad-

dario] and Vitti agree to pursue resolution of the Owner's Dispute with all due diligence by purchasing of the interest of the [VST], or by means of a judicial partition action (and subsequent purchase at auction) or otherwise. . . .' (Emphasis added.)

"The estate of Mr. D'Addario and Vitti have not taken steps to resolve the 'owner's dispute' with the VST by purchasing its 12.5 percent interest, or by means of a judicial partition action. There are sufficient funds in the estate to purchase the 12.5 percent VST interest in the plants. . . . Pursuant to the terms of the 'Option to Extend' contained within the lease amendments, [the defendant] exercised its option on two occasions for each plant through December 31, 2024. . . .

"In 1995, Ferber, then VST's trustee, brought suit against [the defendant] in an action captioned *Ferber* v. *Tilcon Connecticut, Inc.*, Superior Court, judicial district of Fairfield, Docket No. CV-95-0322399-S (*Ferber* lawsuit). This lawsuit was filed by Ferber at the direction of Virginia D'Addario, in response to the lease amendments. . . . The initial complaint in the *Ferber* lawsuit is dated March 31, 1995. . . . The first count pertains to the Danbury plant, and the second count pertains to the Newtown plant. . . . In each count, the plaintiff alleged that, 'the defendant has neglected and refused to undertake to perform its obligations and covenants under the leasing agreement, but instead has entered into an [a]mendment to that leasing agreement with the [e]state of [Mr.] D'Addario, and [the] other remaining Spray Trusts, but without the plaintiff . . . .' The 'leasing agreement' referred to are the 1974 leases. . . . The plaintiff sought specific performance forcing the purchase of the plants and monetary damages in excess of $15,000. . . .

"In response to the initial complaint, [the defendant] filed its answer and special defense on June 2, 1995. . . . In the answer, [the defendant] denied that it breached the original leases. . . . The special defenses included the allegation that VST had accepted rental payments under the lease amendments. In the trial brief, the VST's attorney argued that [the defendant] breached the original leases by entering into the lease amendments, and failing to purchase the plants. . . .

"VST's acceptance of rental payments was an issue litigated at [the trial in] the *Ferber* lawsuit . . . . The Superior Court, *Grogins, J.*, in a memorandum of decision dated August 29, 1996, stated: 'This case turns on whether the language contained in paragraphs sixteen and eighteen [in the original leases] obliges the defendant to purchase a one-eighth interest in the plants. Specifically, the court must determine whether "the premises and the structures and improvements located thereon" can be interpreted to mean one-eighth of the premises, one-eighth of the structures and one-eighth of the improvements, being a fractional share of the

total premises.' . . . The court ruled that 'because the leases do not oblige the lessee to purchase a fractional interest in the asphalt plants, the plaintiff's request for specific performance is denied.'

\* \* \*

"'[T]he court enter[ed] judgment for the defendant on all counts.' . . .

"The Appellate Court affirmed the Superior Court's judgment on November 10, 1998. *Ferber* v. *Tilcon Connecticut, Inc.*, 51 Conn. App. 20, 719 A.2d 921, cert. denied, 247 Conn. 952, 723 A.2d 324 (1998). . . .

"Since approximately July, 1993, [the defendant] has paid rent to VST for both plants pursuant to the rent formula in the lease amendments, as opposed to the rent formula contained in the original leases. The VST's trustees have received and deposited the rent payments under the lease amendments since July, 1993. A number of these checks were endorsed 'without recourse' or 'without prejudice.' . . . Over the years, [the defendant] has provided the VST and other landlords with documentation that demonstrates how rent payments have been calculated in accordance with the lease amendments. . . . Initially, and for a period of time, [the defendant] paid the rents on the plants directly to the estate. The estate would then pay the VST and other landlords. During this period of time, [the defendant] would not have the opportunity to know how the VST would endorse the checks, because they would be returned to the estate. . . . At some point in time, the VST requested that [the defendant] pay it directly. These checks were paid to the order of 'Brent A. Platt Trustee.' . . . [The defendant] was of the belief that the dispute over the rent with the VST ended with its conclusion of the *Ferber* lawsuit.

\* \* \*

"From 1994, going forward, [the defendant] provided the VST with accurate data on how many tons of asphalt were sold at each plant at the fixed rate used to generate an income stream. Virginia D'Addario hired a forensic accountant to examine and verify the data. This examination confirmed the accuracy of the data provided to VST. Virginia D'Addario calculated the monetary difference between the rents due under the original leases and the lease amendments. She examined a six year period of time from April 28, 2009 through April 28, 2015. In order to perform these calculations, she hired a forensic accountant, Steve Pednault, who performed a portion of the work. . . . The calculations are contained in a document prepared for this litigation. . . . The document shows a 'net rental shortfall owed to [VST]' in the amount of $1,435,267.94. . . .

"In 2004, Virginia D'Addario was aware of the fact that [the defendant] had exercised its rights to extend the amendments to the leases for the period of January

1, 2005 through December 31, 2014. . . . However, despite that knowledge, she did not authorize [the plaintiff] as VST's trustee to bring a suit for rent claimed due on the plants. In August, 2013, [the plaintiff] and Virginia D'Addario were aware that [the defendant] exercised its rights to extend the amendments to the leases for an additional ten years through December 31, 2024. . . . Since 1993, the VST has received millions of dollars in rent from [the defendant]." (Citations omitted.)

On September 1, 2015, the plaintiff commenced this action against the defendant. The complaint alleged two counts of breach of contract with respect to the purported failure of the defendant to remit rental payments for the plants in accordance with the terms of the original leases, and two counts of unjust enrichment to recover fair market value of the rental payments in the event of a finding that the original leases were no longer in effect. On May 14, 2018, following a bench trial, the trial court rendered judgment for the defendant on all counts. Specifically, the trial court concluded as follows: The defendant had not exercised its option to extend the original leases with the plaintiff when it entered into the lease amendments with the other holders of the 87.5 percent interest in the plants. The plaintiff's acceptance of the defendant's rental payments in accordance with the terms of the lease amendments did not imply a contract between them. The court found that "there was no mutual understanding between the plaintiff and the defendant as to the contracts' terms and the amount of rent owed for the plants, and, as a result, the VST notified the defendant and stated that the defendant would be considered 'a holdover [tenant]' upon expiration of the original leases."[5] Accordingly, the court held that "the applicable contracts between the plaintiff and the defendant expired on December 31, 1993, and, therefore, there [were] no enforceable contract[s] between the plaintiff and the defendant." This appeal followed. Additional facts will be set forth as necessary.

The dispositive issue on appeal is whether the trial court properly concluded that the original leases expired on December 31, 1993, such that the plaintiff cannot recover contract damages for a purported shortfall in rent for the period April 28, 2009 to April 28, 2015. The plaintiff maintains that the original leases between the parties did not expire on December 31, 1993. Moreover, the plaintiff asserts that the original leases remain in effect until 2024, subject only to the defendant's prior purchase of the plants. In essence, as was made clear during oral argument before this court, the plaintiff views the original leases not as leases, but as contracts to purchase the plants whereby the defendant could postpone the date of purchase only by exercising its option to extend the lease terms of the agreements.[6] In response, the defendant argues that

the original leases were not automatically extended and that, under their express terms, the original leases could be extended only if it exercised the written option to extend them. The defendant contends that because it did not exercise this option with respect to the VST's 12.5 percent interest, the original leases expired at the end of their respective primary terms in December, 1993.[7] We agree with the defendant.

We begin by setting forth the standard of review and the law applicable to our resolution of this appeal. "[A] lease is a contract, and, therefore, it is subject to the same rules of construction as other contracts. . . . The standard of review for the interpretation of a contract is well established. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]. . . .

"In construing a written lease . . . three elementary principles must be [considered]: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; [and] (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible. . . . Furthermore, when the language of the [lease] is clear and unambiguous, [it] is to be given effect according to its terms. A court will not torture words to import ambiguity [when] the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a [lease] must emanate from the language used in the [lease] rather than from one party's subjective perception of [its] terms." (Citations omitted; internal quotation marks omitted.) *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7–8, 931 A.2d 837 (2007).

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages. . . . In order to form a binding and enforceable contract, there must exist an offer and an acceptance based on a mutual understanding by the parties. . . . The mutual understanding must manifest itself by a mutual assent between the parties. . . . In other words, to prove the formation of an enforceable agreement, a plaintiff must establish the existence of a mutual assent, or a meeting of the minds . . . ." (Citations omitted; internal quotation marks omitted.) *Computer Reporting Service, LLC* v. *Lovejoy & Associates, LLC*, 167 Conn. App. 36, 44–45, 145 A.3d 266 (2016).

Although the background of this case is factually complex, our resolution of the plaintiff's claim is rela-

tively straightforward. We first examine the relevant language of the original leases, which are both dated May 13, 1974. Each lease provides for a twenty year primary term.[8] The original leases contain parallel provisions titled "Option to Extend," which provide in relevant part: "Lessor does further grant unto [l]essee the right and option to extend this [l]ease for an additional term of ten (10) years at the expiration of the twenty (20) year [p]rimary [t]erm hereof." The original leases allow for two additional such extensions for a total maximum extension of thirty years. This option may only be exercised by the lessee by providing the lessor with "written notice . . . not less than one (1) year prior to the expiration of the preceding term." In the event the lessee chose not to extend the terms, the leases provided an alternative obligation, namely, a requirement to purchase the leased premises. To that end, the original leases contain matching "[r]equired [p]urchase" provisions, which provide in relevant part: "At the end of the [p]rimary [t]erm of this [l]ease if [l]essee elects not to exercise its option to extend this [l]ease . . . or at the termination of this [l]ease after the . . . options to extend . . . have been exercised, [l]essee shall be obligated to purchase the [p]remises and the structures and improvements located thereon . . . ."[9] Additionally, the original leases each contain a "termination" provision, which provides in relevant part: "In the event during the term of this [l]ease any laws, ordinances or regulations are enacted which have the effect of prohibiting the operation of said asphalt plant . . . [l]essee shall have the right, at its option, to elect to terminate this [l]ease . . . . In addition, [l]essee shall have the right, at its option, to elect to terminate this, [l]ease in the event [l]essor is in violation of [the ingress and egress, and quiet enjoyment provisions without said violation being cured]."[10]

Our review of these original lease provisions reveals that the defendant had two options as the end of the primary terms drew near in December, 1993. First, it could have extended the leases by providing notice to the lessor in the manner required by the terms of the option to extend. Second, if it declined to exercise that option, it had the option to purchase the entirety of the leased property. The defendant chose this second option and did not extend the leases pursuant to their terms. After further negotiations, however, all of the interest holders, with the exception of the VST, agreed to the extensions on modified terms. The VST expressly rejected those terms and did not enter into any other agreement with the defendant.

On the basis of our review of the record, we conclude that the trial court properly held that the plaintiff and the defendant did not form an agreement to extend the terms of the original leases beyond the expiration of the primary term. "In order for an enforceable contract to exist, the court must find that the parties' minds had

truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make." (Internal quotation marks omitted.) *MD Drilling & Blasting, Inc.* v. *MLS Construction, LLC*, 93 Conn. App. 451, 456, 889 A.2d 850 (2006). The evidence adduced at trial demonstrated that, in 1993, the VST's attorney inquired into whether the defendant intended to purchase the plants. When the defendant informed the VST's attorney that it was entering into lease amendments with the holders of the other 87.5 percent ownership interest of the plants, the VST's attorney explained that, in his view, the defendant waived its right to purchase the plants and would be considered a holdover tenant at the expiration of the original term. In short, there was no meeting of the minds between the parties with respect to extending the terms of the original leases.

Consequently, the plaintiff's contention that the original leases expire in 2024 and, a fortiori, the defendant has been obligated to pay the plaintiff rent in accordance with the terms of the original leases, is without merit. In support of this claim, the plaintiff emphasizes the trial court's factual finding that, "[u]nless purchased earlier, [the defendant] had the obligation to purchase the plants at the end of the final term in 2024." That finding does not support the plaintiff's position. To be sure, the trial court also found—and the plaintiff does not dispute—that the defendant entered into the lease amendments through 2024 with the holders of the remaining 87.5 percent interest in the plants exclusive of the VST's 12.5 percent interest. Pursuant to the terms of the quiet enjoyment provisions of the lease amendments, the VST was expressly designated as a nonparty to those amendments. Therefore, the lease amendments for each plant through December 31, 2024, have no bearing on the plaintiff's interests in the plants. Rather, the finding of fact relied on by the plaintiff is entirely consistent with this court's prior holding that the defendant was not required to purchase a fractional interest in the plants. See *Ferber* v. *Tilcon Connecticut, Inc.*, supra, 51 Conn. App. 23.

The fact that the defendant held over with respect to the VST's 12.5 percent interest at the expiration of the original leases' primary term, yet paid rent pursuant to the formulation set forth in the lease amendments, supports the conclusion that the original leases no longer formed enforceable contracts between the plaintiff and the defendant. "The mere act of holding over does not create a new tenancy." *FJK Associates* v. *Karkoski*, 52 Conn. App. 66, 68, 725 A.2d 991 (1999). Upon examining the conduct between the parties at the time of the original leases' expiration, it is evident that the plaintiff continued, through the time of trial, to accept

from the defendant newly calculated rental payments in accordance with the terms of the lease amendments after the defendant held over, creating a month-to-month tenancy with the plaintiff's 12.5 percent interest in the plants.[11] See id.; see also *Bellini* v. *Patterson Oil Co.*, 156 Conn. App. 158, 164, 111 A.3d 987 (2015). Therefore, in the absence of contrary evidence, the original leases between the parties were not renewed by virtue of the month-to-month tenancy. See *United Social & Mental Health Services, Inc.* v. *Rodowicz*, 96 Conn. App. 34, 39, 899 A.2d 85, cert. denied, 280 Conn. 920, 908 A.2d 546 (2006); see also *Welk* v. *Bidwell*, 136 Conn. 603, 608, 73 A.2d 295 (1950) ("where the parties are in definite dispute as to any of the essential terms of a new tenancy, certainly no lease can be implied from the fact that the tenant holds over").

Finally, the plaintiff maintains that because the defendant did not exercise the "[t]ermination" provisions of the original leases, those leases automatically extended beyond December 31, 1993. We do not agree. The termination provisions allowed the defendant to terminate the leases in the event that "any laws, ordinances or regulations [were] enacted which [had] the effect of prohibiting the operation of [the] asphalt plant[s]" or if the lessor violated the ingress and egress and quiet enjoyment provisions contained within the leases, and the violation was not cured. Applying the well established principles of contract interpretation to the original leases, we discern that the parties' use of the terms "termination" and "expiration" in distinct provisions of the leases evinced an intent for those terms to connote different meanings. Generally speaking, a contract is *terminated* when "an action [is] taken to end the contract before the end of its anticipated term." (Internal quotation marks omitted.) *Avis Rent-A-Car System, Inc.* v. *Dayton*, 581 Fed. Appx. 479, 483 (6th Cir. 2014). As indicated by the language of the "[t]ermination" provisions, the leases would terminate only by the happening of the stated conditions, which, by their very nature, could have occurred at any time during the lease term. In contrast, a lease typically *expires* when it reaches the end of its anticipated term. The original leases provided an option to extend the lease for an additional term "at the *expiration* of the twenty . . . year [p]rimary [t]erm hereof." (Emphasis added.) Although the option to extend could have been exercised at any time, the extended term would begin only after the twenty year primary term expired. Therefore, the plaintiff's argument improperly conflates the distinction between the termination and the expiration of the original leases.

In sum, during the operative period for which the plaintiff seeks contract damages, the original leases were no longer in effect. Evidenced by the plaintiff's acceptance of rental payments made subsequent to the expiration of the original leases and commensurate with

the lease amendments, the parties entered into a month-to-month tenancy. See *Bridgeport* v. *Barbour-Daniel Electronics, Inc.*, 16 Conn. App. 574, 579, 548 A.2d 744, cert. denied, 209 Conn. 826, 552 A.2d 432 (1988). Because our law "does not impose the original lease terms upon parties who have not agreed that such terms apply to a holdover tenancy"; *Meeker* v. *Mahon*, 167 Conn. App. 627, 638 n.5, 143 A.3d 1193 (2016); the trial court properly concluded that the plaintiff could not prevail on his breach of contract claims.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] A "spray trust," also termed a "sprinkle trust," is "[a] trust in which the trustee has discretion to decide how much will be given to each beneficiary." Black's Law Dictionary (11th Ed. 2019) p.1824.

[2] The trial court also rendered judgment in favor of the defendant on the remaining claims, specifically, two counts of unjust enrichment. The plaintiff has not appealed from that portion of the judgment.

[3] In light of this conclusion, we need not address the plaintiff's second and third claims.

[4] The trial court separated its factual findings into sixty-five individually numbered paragraphs. For the ease of the reader, we omit the court's use of paragraph numbers, as well as the court's references to the record.

[5] The trial court also concluded that the plaintiff's breach of contract claims were otherwise barred by the six year statute of limitations for contract actions set forth in General Statutes § 52-576 (a) and that the unjust enrichment counts were barred by the doctrine of laches. The court further concluded that all of the plaintiff's claims were barred by the doctrine of res judicata. Because the plaintiff has not appealed from the judgment on the unjust enrichment counts, and our conclusion set forth in this opinion would render any discussion of the defendant's special defenses dicta, we do not address the plaintiff's claims regarding the statute of limitations or res judicata.

[6] We note that the position of plaintiff's counsel at oral argument that the original leases are not, in fact, leases, is belied, not only by the plaintiff's own references to the "leases" in the complaint and his briefing to this court, but also, more importantly, by the express language of the original contracts, each titled "Indenture of Lease," which are replete with references to "this Lease" and to the parties as "Lessor" and "Lessee."

[7] The record does not appear to indicate the precise date that the Danbury lease took effect. The trial court discussed the Danbury and Newtown leases as both expiring on December 31, 1993, as a result of the expiration of the twenty year primary terms contained therein. The plaintiff also maintains that the primary term of both leases ran through December 31, 1993. The defendant contends that the Danbury lease expired in 1994, and the Newtown lease expired on December 31, 1993. This discrepancy has no impact on our analysis.

[8] See footnote 7 of this opinion.

[9] As this court concluded in the appeal in the *Ferber* action, "the only reasonable interpretation of the lease[s] is that the defendant's obligation to purchase becomes mandatory only if 100 percent of the property is sold. The defendant is not required to purchase a fractional share of the properties." *Ferber* v. *Tilcon Connecticut, Inc.*, supra, 51 Conn. App. 23. In this appeal, the plaintiff does not claim that the defendant is required to purchase the VST's fractional share of the leased properties.

[10] The last sentence of the termination provision of the Danbury lease provides: "In addition, [l]essee shall have the right to elect to terminate this [l]ease in the event [l]essor is in violation of [the ingress and egress, and quiet enjoyment provisions without said violation being cured]."

[11] A holdover tenant will be considered either a tenant at sufferance if it merely holds over; see *FJK Associates* v. *Karkoski*, supra, 52 Conn. App. 68; or a month-to-month tenant if the lessor continues to accept the lessee's monthly rental payments following the lease's expiration. See *Bellini* v. *Patterson Oil Co.*, 156 Conn. App. 158, 164, 111 A.3d 987 (2015).